[L. A. No. 11422. In Bank.—April 27, 1931.]

THE FIRST NATIONAL BANK OF CALEXICO, Appellant, v. R. O. THOMPSON, Respondent.

Ault & MacKinnon and Clyde R. Burr for Appellant.

M. C. Atchison for Respondent.

Zach Lamar Cobb, *Amicus Curiae.*

PRESTON, J.—In this cause the opinion of Mr. Justice *pro tem.* Haines, heretofore rendered by the Honorable District Court of Appeal for the Fourth Appellate District has our approval and is hereby adopted as a portion of the opinion of this court herein, as follows:

"Appellant The First National Bank of Calexico, California, brought the present action against the respondent R. O. Thompson to recover the amount of a promissory note for the principal sum of $10,000 executed to it by him, together with interest, attorney's fees and costs. Respondent answered, alleging want of consideration and that the execution of the note was procured by misrepresentations of appellant and its officers and denying liability on it. He, also, by amended cross-complaint sought judg-

ment against appellant bank for the amounts which he had paid by way of principal and interest on a previous note, the execution of which had, as he claimed, been procured without consideration and by the bank's fraud. This pleading was answered by appellant bank, denying the want of consideration and denying the fraud.

"To make clear what is involved, some recital of the history of these transactions will be required.

"On October 8, 1923, the Imperial Valley Finance Corporation, hereinafter referred to as 'the corporation' was incorporated under the laws of California by D. A. Leonard, P. L. Moore and W. H. Lewis, all residents of Calexico in Imperial county. The articles of incorporation fixed the amount of its capital stock at $150,000, to consist of 1500 shares, each of the par value of $100, whereof each of the three incorporators subscribed for one share. The incorporators were named in the articles as the initial directors and, after the certificate of incorporation was received, the directors held a meeting, at which Leonard was made president, Moore secretary and Lewis general manager. Leonard testified that the incorporation was his plan. He was at the time vice-president of appellant bank and largely concerned with its management. The evidence shows that the incorporation was designed as a consolidation of the business of six automobile agencies and garages theretofore operating in the Imperial valley in competition with each other, to-wit: the William H. Lewis Agency; the Gateway Garage and Sales Company, Inc., in which Moore was interested; the Big Four Garage, operated by Leonard's father and three more. These constituent concerns were, at the time, severally indebted to appellant bank in large sums, found by the court to have been, in the aggregate, in excess of $60,000. As of December 1, 1923, when their inventories were taken for the purpose of the consolidation, that of the Lewis agency showed an excess of assets over liabilities of something over $7,000; that of the Gateway Garage and Sales Company, Inc., an excess of assets over liabilities of approximately $23,000, and that of the Big Four Garage an excess of liabilities over assets which, however, Leonard promised to see made up. Of the other three concerns which were, apparently, of relatively small importance, one, at least, had less of assets than liabilities.

Besides the indebtedness of the Gateway Garage and Sales Company, Moore was, at the time of the consolidation, individually indebted to appellant bank on a ten thousand dollar note. Because of the claim that the net assets of his Gateway Garage and Sales Company, which were being turned in to the new concern, so greatly exceeded in net value those which were being turned in by Lewis' agency, an adjustment was made whereby the $10,000 Moore note to appellant bank was canceled and Moore and Lewis each executed to the bank a new note for $5,446. How the amounts of these were determined the evidence does not show in detail. Besides executing one of them, Lewis, either as part of the assets of his agency or else as a contribution from himself outside of it—but, in any event, as part of the initial scheme of equalization, made over to the new company a cash balance, then standing to his credit in appellant bank, of $6,978.34. This is all the cash with which the organization started.

"Though no stock had been issued, the corporation began to function late in 1923, automobiles which it acquired for sale being, according to the expression used in the trade, 'floored' by appellant bank; which, apparently, meant that the bank loaned the corporation the money to buy them and took warehouse receipts for the cars as security. In May, 1924, after the corporation had actively operated something like six months, by reason of indebtedness of the constituent concerns which it assumed, and of new advances obtained and expenses incurred, it found itself indebted in the aggregate amount of $73,529.93, of which $67,349.31 represented obligations to appellant bank, including an overdraft of $125.77. The corporation had, in the month preceding, sustained an operating loss of $5,016.69. There is testimony that the assets of the Gateway Garage and Sales Company, put in as exceeding its liabilities by $23,000, were, as time went on, discovered to have really been less than its liabilities by about $9,000.

"On June 25, 1924, the corporation filed with the commissioner of corporations an application for leave to issue to Leonard, Moore and Lewis, therein stated to be the only persons interested in it, 100 shares each of its stock, of the par value of $100 per share, 'in return for cash, services and assignments of assets'. The application stated

the investment of each of the three incorporators to be $10,000. On June 28, 1924, the commissioner responded by asking a formal appraisal of the worth of the automobile agencies and tangible assets taken over, verified by two disinterested persons familiar with the facts. No such appraisement was ever furnished and no permit to issue any stock was ever granted, and no stock ever actually issued to anybody.

"By August, 1924, matters had reached such a posture· that Lewis was dissatisfied and insistent on getting out, freeing himself from liability, and recouping something of what he had put in, to accomplish which he threatened to sue his associates and the bank for having by misrepresentations induced him to participate in the incorporation. This action was forestalled by a settlement effected on August 28, 1924, whereby Lewis, though no stock had yet been issued to him, sold his interest in the corporation to Leonard and Moore, the consideration being their agreement to see that his $5,446 note to the plaintiff bank was cancelled, and their payment to him of $3,150. The court has found that:

"'Immediately thereupon the plaintiff herein and its president, J. M. Edmunds, and the said D. A. Leonard made and entered into a fraudulent plan and scheme to induce the defendant to assume the said indebtedness of the said W. H. Lewis to the plaintiff and to fasten upon the defendant the liability of a stockholder for any and all debts due and owing from the said Imperial Valley Finance Corporation to the plaintiff.'

"It has found further that:

"'On or about the 28 day of August, 1924, in furtherance of said fraudulent plan and scheme, the plaintiff bank and its president J. M. Edmunds and Vice President D. A. Leonard, solicited the said defendant herein and offered for sale to said defendant 100 shares of capital stock in the Imperial Valley Finance Corporation and did fraudulently and falsely represent to said defendant that said Imperial Valley Finance Corporation was a growing concern, with an established business, a good organization, doing a large business, and with little or no liabilities, and that he had an opportunity by such investment to make a lot of money, and that if said defendant would pay off or assume the indebtedness of the said W. H. Lewis to the bank, that

the said First National Bank would thereupon issue and transfer or cause to be issued and transferred the said 100 shares of capital stock to the defendant, each and all of which representations were false and untrue and were by plaintiff bank and its President, J. M. Edmunds, and Vice President, D. A. Leonard, known to be false and untrue.'

"The court found, also, that the whole scheme of incorporating the Imperial Valley Finance Corporation was conceived by Leonard in the interest of the bank, and that the bank, Edmunds, its president, and Leonard, its vice-president, all knew of the heavy obligations which the corporation had assumed, and knew that the subscriptions for its stock had not been paid, and that it had been granted no leave to issue any of its stock, and that none had been issued, but fraudulently concealed from respondent all of these circumstances; that appellant bank, claiming that Lewis' note to it for $5,446, had been given for his 100 shares of stock in the corporation, by said fraudulent representations induced respondent to execute to it his own note for such $5,446 (in lieu, that is, of the Lewis note); that this was from time to time renewed and finally paid by respondent, with interest which aggregated $1,168.75, but that none of the stock which respondent was to get for it was ever issued or delivered to him. In October, 1925, on application by the corporation to the court, its name was by court decree changed to 'Moore Motors Company, Inc.' According to the further findings of the court, appellant bank, on February 4, 1927, 'in furtherance of its fraudulent plan and scheme aforesaid', filed in the superior court of Imperial county, an action against the Moore Motors Company, Inc., and Leonard Moore and respondent Thompson, as stockholders therein, on a promissory note of the corporation for $38,050, asking judgment against respondent Thompson as a stockholder for a third of the amount of the obligation, that is, for $12,683.33 and attorney's fees and costs; and on the same day, 'in furtherance of its said fraudulent plan and scheme', filed, in the same court, a further action against the same parties on five notes executed by the corporation aggregating $28,424.80, in which it sought to charge Thompson with an additional stockholder's liability in the sum of $9,474.92 and attorney's fees and costs. It

was further found that thereafter, in furtherance of said fraudulent scheme and plan, respondent Thompson was called to the bank; that the officers of the bank told him that the bank had reached an agreement with Leonard and Moore to compromise and settle the two suits; that Leonard and Moore had each agreed in settlement of their shares of the liability to execute to the bank a note for $12,500 and that if respondent would do likewise the bank would credit thereon as though paid $2,500, thus leaving defendant liable to it for only $10,000; that the officers of the bank fraudulently represented to respondent that he was a stockholder of the debtor corporation and that unless he made the settlement suggested, the actions brought would be pressed to judgment and that he would be holden to his liability for the full amount claimed as against him, from which liability as a stockholder he would have no escape; that, while in the bank, respondent was without counsel, although the bank had counsel present; that respondent believed what was said to him by the bank's officers and believed that he was liable as claimed by them and, in that belief, signed the note demanded of him, though he was not a subscriber to the stock of the obligor corporation, nor a stockholder therein at all, and under no liability to the bank; that had he known the facts he would not have signed the note, and that afterward on June 1, 1927, when he learned the truth, he gave the bank written notice denying his liability on the note and repudiating the settlement.

"The court refused to allow appellant bank to recover anything on the $10,000 note sued on, but gave judgment in favor of respondent Thompson cancelling that note, and gave him judgment also against the bank for $6,614.75, the aggregate of principal and interest which he had paid in discharging his original note as from time to time renewed, with interest on that sum from May 20, 1927, the date when he had completed paying it off. It is from this judgment that the present appeal is prosecuted.

"There is ample support in the record for the court's finding that the action of the bank and its officers in originally enticing Thompson into the enterprise was wilfully fraudulent. Thompson was a practicing physician, busy with his profession, a patron of the bank, had known

its president, J. M. Edmunds, in Iowa in boyhood and had all confidence both in him and in Leonard. Upon the very morning (August 28th) that Lewis had forced the adjustment with Leonard and Moore, Edmunds first telephoned to Thompson and then went to his office. According to Thompson's testimony, Edmunds told him that the Imperial Valley Finance Corporation's affairs had been rearranged; that Lewis was out; that Leonard and Moore were managing it; that there was an opportunity for him to take over the share that Lewis had, and it looked like a 'good thing', a 'good growing business'; that 'they have got a good organization and they ought to make some money out of it'; that the one hundred shares available were worth a hundred dollars apiece; that 'all you have to do is assume the amount of money that this fellow Lewis left at the bank' (that is the amount of Lewis' note to the bank which was to be cancelled). Edmunds, respondent says, told him that 'your note is good with us. We will take your note for it. You won't have to put up any cash.' Thompson says that he inquired whether the corporation was in good shape, to which Edmunds replied by enumerating the agencies it controlled, mentioning a lease it had, stating that 'the money they owe and what they own, their assets, are about even.' Edmunds, Thompson says, then left, saying that he would send Leonard and Moore over to talk with him. Leonard and Moore accordingly came in within fifteen minutes. They had with them some sheets of paper with some figures on them, but Thompson was busy and did not examine these, but asked them what shape they were in. They replied that they 'practically had the automobile selling business of the valley corralled', that it was a 'good thing; it looked like a mighty good thing'. After lunch respondent went over to the bank and saw Edmunds, saying that it 'sounds pretty good to me', to which Edmunds responded: 'I think it is, and I don't think you will make any mistake, and in order that you can go ahead with it we will fix you up right away.' Edmunds thereupon referred Thompson to his son Carl, who handled the note department of the bank and he produced a note already written out ready to be signed. It had been pinned to a sheaf of papers, including the Lewis note for the same amount, from which Carl Edmunds

detached it for Thompson to sign. Thompson says that he asked what these papers were and Carl Edmunds 'told me it was a certificate for 100 shares of stock to be left with these other papers'. The evidence shows that what had actually been left with the bank with the Lewis note was not a stock certificate, but a statement of the corporation signed by Lewis himself as its vice-president, and Moore as its secretary; that the corporation would issue to Lewis' order 100 shares of its stock, stated to have been fully paid for. Lewis had endorsed his name on the back of this. It is only fair to say that one of the attorneys representing appellant in the present litigation, whose good faith we have no reason to question, has testified that, on the evening before Lewis withdrew, he met Edmunds, Leonard and Thompson at the bank and discussed with them the situation, including the fact that no actual leave had been obtained from the state to issue any stock. Thompson, however, positively denies that he was there, and in view of the trial court's findings it must be taken to have decided on conflicting evidence that he was not. If he was not, then the fact that Edmunds and Leonard held such a conference in the evening of August 27th, would tend to support the trial court's view that the whole scene was prearranged by Edmunds and Leonard before respondent was introduced to it, and the stage so set by them that Lewis would not meet respondent in connection with the matter, and the possibility of complicating explanations would be avoided. If the court believed Thompson's testimony about what Edmunds and Leonard on August 28th said to him, as it had the right to do, and believed, as was its right, that Thompson had not been present at the conference at the bank on the previous evening, there was nothing unreasonable about its finding that the conduct of Edmunds and Leonard was intentionally fraudulent. It would, indeed, under the evidence require considerable credulity to believe that either of them was unaware that the corporation was already insolvent; and they had every motive for wanting to replace Lewis by some obligor whose responsibility would afford some apparent justification for the excessive credit that the bank had extended to it.

"The difficulty which this case presents arises, not from any lack of justification for the trial court's view of the

moral quality of the bank's action and that of its officers in inducing Thompson to go into the corporation, but rather from his own long acquiescence in the situation in which he found himself, and various acts on his part relied on by appellant as amounting to a ratification of what had been done. Among these were the following:

"He renewed his $5,446 note to the bank seven times, that is, on February 28, 1925; on August 28, 1925; on September 15, 1925; on March 15, 1926; on September 15, 1926; on December 3, 1926, and on March 3, 1927, paying the accrued interest when he made the several renewals, and finally paid off the principal in four installments, i. e., on April 15, 1927; May 10, 1927; May 18, 1927, and May 20, 1927, with the last instalment paying also the remaining interest.

"He, in addition to all other notes that he signed, borrowed at Leonard's importunity, on or about January 30, 1925, $10,000 of appellant bank, for which he gave his note, the proceeds of which he turned in to meet corporate obligations to the bank. This note he afterward paid in full and it is not one of those involved in the pleadings here.

"He appears on the minutes of the corporation to have participated in a stockholders' meeting on April 1, 1925, the minutes whereof recite that Lewis had sold him all of Lewis' interest in the corporation and its assets; and appears according to the minutes to have been, at that meeting, elected a director, and also to have participated, at that meeting, in voting for the change in the corporate name and in voting to approve everything done by the 'directors of this corporation for the past year or during their term of office'. He appears on the minutes to have also participated in a directors' meeting on September 1, 1925, at which, for the ensuing year Leonard was elected president, he, Thompson, vice-president, and Moore, secretary; and where action was taken to accomplish the change of name by application to the superior court. He testified, indeed, that these meetings were not in fact held, otherwise than by personal and telephonic conversations between the three participants, Leonard, Moore and himself, pursuant to which the minutes were written up by the corporation's attorney who was counsel also for the bank; but, at all

events, he signed on the minutes the waiver of notice of the meetings.

"Moreover, despite respondent's assertion and the court's finding that he would not have signed the note of February 9, 1927, now sued on, if he had known 'the true facts at that time', it appears from his own testimony that, as he says, 'about two or three weeks after I signed my note and purchased my shares', his attention was called by Carl Edmunds to an overdraft by the corporation of something like $10,000 on the bank, when, in response to his inquiries, Carl Edmunds said to him that 'They are not in very good shape' and that he had 'better get after those boys and straighten this thing out', and that 'it is all balled up and muddled up and you better see Dan (Leonard) about that'. He went to Leonard and got assurances of a general sort, but no satisfaction. With reference to the execution on January 30, 1925, of the $10,000 note, already referred to, he testified that he and Leonard met with Moore at the latter's house when Leonard 'told me . . . more money had to be put up to cover overdrafts to straighten the affairs with the bank or we would have to close up', to which respondent replied that he had gone about as far as he could 'with this thing', that he was getting tired of it and thought it had best be allowed to 'blow up'; that he had never had any stock issued to him, to which Leonard replied in substance that he owned 100 shares and was liable as a stockholder and that the money would have to be put up, that Moore could put up nothing, that he, Leonard, had arranged to put up $10,000 and that it would be 'up to' respondent and himself to 'get by the bank examiner who is here today', and who would examine the bank's books on the day following. Leonard suggested that respondent borrow the money at appellant bank, which after much protest he proceeded to do, turning the proceeds in to the corporation's credit.

"Respondent also testified to talking with J. M. Edmunds at the bank in December, 1926, and telling him that respondent 'didn't feel very good' about the enterprise, that 'it was misrepresented to me and I was foolish enough to bite', and that Edmunds 'had to . . . help me out of it'. No stock having been issued, they discussed the possibility of issuing all but one share to Leonard and Moore and

one share only to respondent, so that, instead of being holden for the whole liability, respondent would have only that corresponding to one share. They went to see Edmunds' attorney (representing also the bank) about it, who said it could not be done, that respondent's name was down on the records of the state for 100 shares. On the way out respondent remarked to Edmunds 'Well, I am stuck. I guess I will have to face the music. That is all there is to it.' It must be said that whatever his experience and standing in his profession, the record shows that so far as this enterprise was concerned respondent was as plastic clay in the hands of his associates and appellant bank. He had no real part in managing the corporation. With forebodings and protests he signed his name whenever he was asked to sign it and renewed and paid notes which were obtained from him.

"It cannot be doubted that if Leonard and Moore had acquired from Lewis any rights in the corporation or its stock susceptible of transfer to respondent, then that the latter had the right to treat the transaction of August 28, 1924, despite its nebulous form, as amounting to an equitable assignment to him of such rights.. (*Wiggins* v. *McDonald,* 18 Cal. 126; *McIntyre* v. *Hauser,* 131 Cal. 11 [63 Pac. 69]; *Goldman* v. *Murray,* 164 Cal. 419 [129 Pac. 462]; *Title Ins. Co.* v. *Williamson,* 18 Cal. App. 324 [123 Pac. 245, 247].) Neither is there any real doubt that if his acquisition of such rights or stock were capable of ratification at all, respondent's conduct would have amounted to a ratification of the entire transaction and a waiver of all right to complain of its fraudulent character. We have seen that he testified himself that at the conference at Moore's house in January, 1925, he himself brought up the fact that no stock had been issued to him. Of this he was fully aware also in his talk with Edmunds in December, 1926. There is undenied evidence in the record that after the two actions were commenced in January, 1927, in which appellant bank sought to enforce as against him liability as a stockholder in the corporation, respondent consulted an independent attorney. True, he was not represented by counsel at the gathering with his associates and the bank officers on February 9, 1927, when the compromise was arranged and his note, now sued on, given. True, also, the bank

was, at that conference, represented by its own attorney, who expressed his view that it could succeed in its contention. But respondent, having previously talked to an independent attorney, had himself to blame if he had none present at the conference. Not only did he, pursuant to the conclusions there reached, give the note on which he is now sued, but he continued for months afterward to stand on his ratification of the transaction by another renewal of the $5,446 note to appellant bank, by paying interest on the renewed note, and by paying off the principal in instalments. As was said in *Bancroft* v. *Woodward,* 183 Cal. 99, 108 [190 Pac. 445, 449] :

" 'It is well settled that where a party has knowledge of facts of a character which would reasonably put him upon inquiry and such inquiry if pursued would have led to a discovery of the fraud or other ground for rescission, he will be charged with having discovered the fraud or other ground as of the time he should have discovered it, that is of the time when he would have discovered it if he had with reasonable diligence pursued the inquiry when he should have done so.' (Citing *Lady Washington etc. Co.* v. *Wood,* 113 Cal. 482 [45 Pac. 809] ; *Harrington* v. *Patterson,* 124 Cal. 542 [57 Pac. 476]; etc.)

"In the instant case respondent's situation is worse. Not only did he have the knowledge of such facts as should have put him upon inquiry as to whether or not a fraud had been committed, but he had actual knowledge of the circumstances which amounted to the fraud long before he entered into the compromise agreement, and, knowingly entered into it. It is suggested, indeed, that whatever he may, at the time he made the compromise have known about the facts and even about the fraud, he was not as yet 'aware of his right to rescind' (Civ. Code, sec. 1691). But in *Bancroft* v. *Woodward, supra,* the court said (p. 108) :

" 'It is at least intimated in *Ruhl* v. *Mott,* 120 Cal. 668, 679 [53 Pac. 304], and *Hannah* v. *Steinman,* 159 Cal. 142, 153 [112 Pac. 1094], that the rule is the same in regard to the time as of which a person seeking rescission will be charged with knowledge of his right, as it is in regard to the time as of which he will be charged with discovery of the facts which give him the right and the reason for

this is so plain that we have no hesitation in declaring it to be the case.'

"It is nevertheless our opinion that respondent never became a stockholder in the corporation nor acquired any interest in it. The Corporate Securities Act (sec. 2, subd. 3) defines a 'company' as including 'all domestic and foreign private corporations, associations, joint° stock-companies and partnerships . . . ', with certain specified exceptions. A 'security' is defined (sec. 2, subd. 6) as including 'all shares or other interests or rights into which the capital, capital stock or property of companies or rights of stockholders or members thereof are divided . . . ', including 'all certificates and other instruments issued by them (i. e., companies) or their authority evidencing or representing such shares, interests or rights . . . '. By section 3 of the act a company, except as authorized by certain specified statutory provisions inapplicable here, is forbidden to sell or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall first have applied for and received from the commissioner a permit authorizing it so to do. By section 12 any security issued by a company without such permission is declared void. Section 13 makes it criminal for any company to 'directly or indirectly issue or cause to be issued any security contrary to the provisions of this act . . . '. Section 14 declares any 'officer, agent or employee of any company and every other person who knowingly authorizes, directs or aids in the issue or sale of . . . any security . . . contrary to the provisions of this act . . . ' to be guilty of a crime. No permit here was ever given to the corporation to issue any part of the 100 shares of stock for which respondent bargained. It cannot be doubted that the corporation's issuance of the stock receipt that Lewis had pledged with the bank was a violation of the statute as an attempt indirectly to do what it could not do directly. Plainly there was no valid subscription at all for 99 out of the 100 shares which respondent thought he was buying. The articles of incorporation do, indeed, recite a subscription by Lewis for one share and, under section 25 of the Corporate Securities Act, subscriptions made prior to the organization of the corporation, if disclosed in its articles, are provisionally valid, though subject to seasonable application for leave to issue

the corresponding stock. No doubt if the result of the transaction of August 28, 1924, in fact was that respondent acquired even this single share, he would be responsible as a stockholder for one-third of such obligations as the corporation should thereafter incur. In other words, it would make no real difference whether he, Leonard and Moore were validly entitled to one share each or 100. In either event their proportionate interests would be the same. We are then brought to the question whether Lewis' subscription for the one share of stock for which he must be assumed to have validly subscribed, was legally subject to transfer. In our opinion the whole tenor of the Corporate Securities Act as evidenced by the provisions cited, indicates that it was not. Section 25 places no limit on the number or value of shares for which such preorganization subscriptions may be made. Were it permissible to place inchoate rights of the subscribers to receive such stock on the market, promoters could readily defeat the whole object of the act by the simple device of subscribing for all of the stock in advance of the organization, setting out their subscriptions in the articles, and then proceeding to parcel out to the public and sell the subscription rights, passing on to the buyers the responsibility for securing from the corporation commissioner the permit to have their stock issued with the chance of failing altogether in the effort. ▮ Section 25 of the act in so far as it admits of such preorganization subscriptions would, as we think, be more rationally construed as, *ex necessitate* and to make the incorporation possible, merely reserving to the incorporators the privilege personal to themselves and temporary in character, of making such preorganization subscriptions, but without any right of *inter vivos* alienation. But, whether in this view we are right or not, the section was and is explicit not only in subjecting the right to make such subscriptions to the condition that the corporation shall be incorporated within 90 days thereafter, but also to the further condition that when incorporated it 'shall with reasonable diligence apply for and secure from the commissioner a permit authorizing the issue of the shares so subscribed for in accordance with such subscription'. In this case it was nearly nine months after the incorporation was perfected before any application to issue any stock was made, and after it was made two months

more had expired before the attempted sale to respondent, without compliance by the corporation with the prompt request of the commissioner for the data needed to enable him to act. In these circumstances we do not think that either Lewis or his associates had either stock or stock subscriptions which could be the legitimate subjects of a sale, and we think that the attempted sale to respondent was a plain evasion of the statute.

"Moreover, the original arrangement with respondent being, as to 99 of the 100 shares of stock involved in it unquestionably illegal, the illegality would taint the whole, even though the subscription right to the one share had been otherwise legally transferred. It was said in *Tatterson* v. *Kehrlein,* 88 Cal. App. 34, 52 [263 Pac. 285, 292], a case which, like the present, involved charges both of fraud and violation of the Corporate Securities Act that:

" 'In this state it is the rule that if any part of the consideration of a contract is illegal, the contract is wholly void. In *Teachout* v. *Bogy,* 175 Cal. 481 [166 Pac. 319], the court uses this language: "If any part of a single consideration for one or more promises be illegal, or if there are several considerations for one promise, some of which are legal and others illegal, the promise is wholly void, as it is impossible to say which part or which one of the considerations induced the promise. Thus, if the consideration for a note or other promise to pay a certain sum of money be the sale of goods, some of which it is legal and some of which it is illegal to sell, the note or promise cannot be enforced (9 Cyc. 566; see, also, 1 Elliot on Contracts, sec. 248; *Moffatt* v. *Bulson,* 96 Cal. 112 [31 Am. St. Rep. 192, 30 Pac. 1022]; *Vulcan Powder Co.* v. *Hercules Powder Co.,* 96 Cal. 510 [31 Am. St. Rep. 242, 31 Pac. 581]; *Humboldt County* v. *Stern,* 136 Cal. 63 [68 Pac. 324])." In the present case "every part of the consideration goes to the whole promise, and therefore, if any part of it is contrary to public policy the whole promise fails". (*Hazelton* v. *Scheckells,* 202 U. S. 71 [6 Ann. Cas. 217, 50 L. Ed. 939, 26 Sup. Ct. Rep. 567; see, also, Rose's U. S. Notes]; see, also, *Prost* v. *More,* 40 Cal. 347; *Mission Brewing Co.* v. *Rickert,* 39 Cal. App. 668 [179 Pac. 720]; *Teachout* v. *Bogy, supra.)* '

"See, also, *Castle* v. *Acme Ice Cream Co.*, 101 Cal. App. 94 [281 Pac. 396].

■ "From the views expressed it follows that respondent never had anything more than a *de facto* status in the corporation. What might be his responsibility to those who innocently dealt with the corporation in reliance on his apparent connection with it, we need not inquire. Appellant bank, a party to the fraud whereby he was led to invest, was in no position to rely on any estoppel arising out of his *de facto,* as distinguished from his *de jure* position. It brought suit on a statutory stockholder's liability. So far as it was concerned, respondent not being a stockholder, had no liability. Appellant at least cannot be heard to say that his asserted liability had any other basis.

■ "Undoubtedly the compromise of pending litigation, prosecuted in good faith, whether actually well founded or not, is ordinarily sufficient consideration for a promise. It has been held, however, that the compromise of an obligation given for an illegal consideration furnishes no consideration for a new promise, and that that is true whether, when the promise is made, an action is pending on the original obligation or not. (*Union Collection Co.* v. *Buckman,* 150 Cal. 159 [119 Am. St. Rep. 164, 11 Ann. Cas. 609, 9 L. R. A. (N. S.) 568, 88 Pac. 708].) ■ It has also been held that an arrangement involving the purchase of stock for the issuance of which no permit exists, is absolutely void and incapable of ratification by anything which the purchaser can do, either as to the corporation (*Reno* v. *American Ice Machine Co.,* 72 Cal. App. 409 [237 Pac. 784]) or as to its creditors (*Honn* v. *Hauser,* 81 Cal. App. 276 [253 Pac. 336]). ■ From these authorities it follows that neither respondent's laches nor his affirmative acts were effectual, to render him liable to appellant either upon a stockholder's liability or on the note which he gave to compromise the actions brought to enforce that liability. He could have condoned the fraud, but his ratification was ineffectual to create an arrangement void from the beginning under the statute.

"In *Tatterson* v. *Kehrlein, supra,* it was said (p. 49): ' "The doctrines of estoppel by conduct and ratification have no application to a contract which is void because

it violates an express mandate of the law or the dictates of public policy. Such a contract has no legal existence for any purpose and neither action nor inaction of a party to it can validate it and no conduct of a party to it can be invoked as estoppel against asserting its invalidity." (*Reno* v. *American Ice Machine Co., supra;* see, also, *Colby* v. *Title Ins. Co.,* 160 Cal. 632 [Ann. Cas. 1913A, 515, 35 L. R. A. (N. S.) 813, 117 Pac. 913]; *MacRae* v. *Heath,* 60. Cal. App. 64, 72 [212 Pac. 228]; *Reilly* v. *Clyne,* 27 Ariz. 432 [40 A. L. R. 1005, 234 Pac. 35, 39].)'

"It remains to decide whether respondent was entitled to judgment on his cross-complaint for the principal and interest paid on his $5,446 note to the bank as from time to time renewed. That note he originally gave not through a mistake of law, as counsel seem to contend, but, according to the findings, because the facts were misrepresented to him, and, among other things, he believed that the 100 shares of stock had been actually issued. If he had moved with any sort of promptitude there is no doubt that he might not only have obtained, as against appellant bank, a cancellation of this original note, but that he might have recovered also anything theretofore paid on it. For, as was said in *Tatterson* v. *Kehrlein, supra* (p. 49) :

" 'The penalties prescribed by the Corporate Securities Act being all laid on the seller and none on the buyer the statute being for the benefit and protection of buyers, the parties are not *in pari delicto* and the buyer may have judgment for the money paid out by him under the illegal contract, and may have the contract, the stock certificate, and the promissory note given in payment of such stock canceled.' (Citing numerous cases.)

"It has therefore been repeatedly held in this state that he who purchases units or shares in a company under a sale void because in violation of the Corporate Securities Act or other statute, may recover what he has paid in an action for money had and received. (*Smith* v. *Bach,* 183 Cal. 259 [191 Pac. 14]; *Reno* v. *American Ice Machine Co.,* 72 Cal. App. 409 [237 Pac. 784]; *Grove* v. *Barrett Co.,* 87 Cal. App. 165 [261 Pac. 739]; *Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285]; *Barrett* v. *Gore,* 88 Cal. App. 372 [263 Pac. 564]; *MacDonald* v. *Reich & Lievre, Inc., et al.,* 100 Cal. App. 736 [281 Pac. 106].)

"None of these cases, however, go to the extent to which we are asked to go here. In the instant case respondent, as we have seen, years after he knew substantially what the true facts were, and after he was fully cognizant of the fraud and was charged with knowing what his legal rights were as well, continued from time to time, and without any particular duress to renew his note, and finally paid it. These affirmative acts, continued for a time which seems to us wholly unreasonable, bring him within the rule that he who makes a voluntary payment cannot recover. (*Hanford Gas Co.* v. *Hanford,* 163 Cal. 108 [124 Pac. 727]; *Leahy* v. *Warden,* 163 Cal. 178 [124 Pac. 825]; *Huddleston* v. *Washington,* 136 Cal. 514 [69 Pac. 146].)"

Upon the reconsideration of this cause it was urged that to sustain respondent's defense to the cause of action sued on in the complaint and to deny him relief on the one in his cross-complaint was to create an inconsistency in the holding of the court. This contention is not sound. The one holding sustained the defense that he was not a stockholder of a corporation because of fraud, accompanied by a violation of the statute; the other denied affirmative relief because, with full knowledge of the fraud practiced, he made ratification thereof by repeated renewals of the obligation and later voluntarily discharged it in full. The law withholds its aid from one of the latter class who is so unmindful of his rights. Appellant did not and could not sell the unissued corporate stock to respondent. The court found this attempt to have been made by another.

The doctrine of the effect of a contract of sale of stock without a permit is therefore not applicable to the latter cause of action. Appellant had the obligation of Lewis and by participating in a fraudulent scheme respecting an unlawful attempt to sell stock owned or claimed by another, induced respondent to assume the indebtedness of Lewis to it. The net result then is that appellant was guilty of fraud, but did not make a contract to issue or sell corporate stock in violation of law and, as above noted, respondent, with full and long-standing knowledge thereof, paid the obligation. This delay may have prevented appellant from securing relief from Lewis. At any rate, the payment was purely voluntary and the courts are not open to this claim under such circumstances.

The judgment, in so far as it denies appellant any recovery against respondent, is affirmed, but, in so. far as it awards to respondent judgment upon his cross-complaint, it is reversed.

Curtis, J., Shenk, J., Richards, J., Langdon, J., Waste, C. J., and Seawell J., concurred.