[Civ. No. 17373.   First Dist., Div. Two.   July 1, 1957.]

MIKE ELKIND et al., Appellants, v. H. E. WOODWARD et al., Respondents.

Yale H. Smulyan for Appellants.

Alfred M. Miller for Respondents.

KAUFMAN, P. J.—Plaintiffs commenced an action against the defendants to recover damages alleged to have been sustained by reason of false representations in the sale to the plaintiffs of a bar, located at 115 Mason Street, San Francisco, California. Plaintiffs appeal from the judgment entered in favor of the defendants reciting that the plaintiffs did not rely on the alleged misrepresentations. The case was heard in the Superior Court of the City and County of San Francisco without a jury.

On Sunday, January 18, 1953, the following ad appeared in the San Francisco Examiner:

"Bar—Gross $10,500 Mo. No show or food. Low overhead. Nets $3,000 Mo. 1235 Van Ness. TU 5-5077."

The above address and phone number was that of the Hughey Investment Company. On January 19, in response to this ad, Mike Elkind, one of the appellants, contacted Mr. Chester Hughey, owner of the above company. He was told the ad referred to the Robin Hood Bar, located at 115 Mason Street. Hughey stated the bar was now doing $10,000 a month

but during the winter months business increased to $10,500. The "Prospective Buyers Agreement" signed by Mr. Elkind stated the bar's gross to be $10,500. This agreement contained the following clause, "Hughey Investment does not warrant any information as to the status of the above-named business and/or businesses." The bar's owners, respondents H. E. Woodward, W. E. Drysdale and W. E. Lyon, testified they had never represented that the Robin Hood Bar grossed $10,500 or that it grossed over $6,000-$7,000 a month.

An exclusive sellers agreement between respondents and the Hughey Investment Company was introduced into evidence. It showed the gross as $10,500 and the earnings as $3,000 net per month. Respondents testified these figures had not been inserted into the agreement at the time they signed it or they had not looked at the paper when they signed it. The agreement was signed on June 17, 1952, and was to run for 60 days. The bar was not sold by the investment company during that period.

After signing the "Prospective Buyer's Agreement," Mike Elkind went to the Robin Hood Bar with Mr. Hughey. Elkind testified he had never been in the bar before this time and that he had not previously known of a Mason Street in San Francisco, although he has lived in the San Francisco area for 35 years. Mr. Elkind owned a wine and beer establishment at Fourth and Howard for four years and at the present time owns several pieces of income property as well as conducting an egg business. His net worth is over $100,000 but he did not know the exact amount.

On the first visit to the Robin Hood Bar Mr. Woodward quoted the gross at $10,500, the net profits at $3,000 per month and told him the rent. He was shown the Daily Book when he requested to see the Books.

Mr. Kohn, Elkind's accountant, testified Elkind had asked him to stop by the bar sometime and see him so they could look over the books. No time was specified. Elkind was behind the bar when Kohn went there. There is no testimony showing an attempt to look at the books on this visit. Kohn stated he later tried to see the books but he was only at the bar in the mornings and it was closed. Several years before he had checked the books of a bar at Third and Townsend for Elkind. Since Mr. Kohn was busy with income tax returns, Elkind hired another accountant, a Mr. Price. Mr. Price testified that he became acquainted with the appellant several months before, when Mr. Elkind had been interested in pur-

chasing a bar in Marin County. Price had gone over those books with him.

Elkind told Price he had arranged an appointment with the owners to examine the books. Price went to the bar at the appointed hour and was met by Woodward who informed him he did not have the books. Woodward told him the bookkeeper kept the books. Price asked if he could get in touch with the bookkeeeper and was told that he did not have a phone, did not have an office and would just drop into the bar on Saturdays. He did not tell him the bookkeeper's name and indicated there was no need to look at the books. Price stated that Woodward seemed a little put out because he mentioned Elkind's bookkeeper had been there asking to examine the records and that Elkind had been observing the operations of the bar several nights in a row.

Price was given copies of sales tax returns for April 1952 to March 1953. After examining the returns he reported to Elkind that there was no prima facie evidence showing the gross as $10,500 and the returns indicated the volume to be between $6,000-$6,800. He told Elkind he was in no position to report the actual gross of the bar.

The next day Elkind returned to Price's office with Hughey. Hughey insisted the bar was doing $10,000-$10,500 and indicated all the sales were not being reported.

It was shown Elkind was familiar with sales tax returns, having made them out when he had the wine and beer establishment and in his egg business. When Elkind confronted Woodward with Price's report he was told they were doing $10,500. Woodward then copied figures from a day book, saying they represented the average per day for 10 days; the total amounted to $3,891.35. Woodward stated the figures represented the business they would have to do to gross $10,000. Elkind testified that at Woodward's suggestion he helped make up the deposits and these showed a gross of between $350-$400 and a little less than $300 per day.

Mr. Dunlap, respondents' bookkeeper, testified that he talked with Elkind and an auditor at the bar before March 23. At that time he laid out the books and the sales tax returns. He remembered seeing the auditor list the sales tax but did not remember whether he looked at the books. He saw Elkind again before the purchase and told him the bar was doing about $6,500. In addition to their drawing account, they would get a monthly commission ranging from $75 to $150 a month. He said he would make the books available if

Elkind wanted someone to check them and suggested doing this. After Elkind purchased the bar he retained Dunlap as his bookkeeper.

Testimony showed Elkind observed the bar continuously from the time he saw the ad. He visited the bar at different hours of the day and night and the length of these visits varied. He was frequently seen behind the bar before March 23d.

From January 19th until March 23d, Elkind testified he went to the bar to look it over and to determine if he was satisfied with the trade. He knew it was almost exclusively sailors. He told respondents he was satisfied but intended to clean the place up and to bring in businessmen. He was determined to get rid of a certain amount of patronage. After buying the bar, if he believed a person came in for an immoral purpose he would turn his back and refuse to serve him. While he had seen girls in the bar, he stated he did not know what a "B" girl was until after he took over the management when he decided the girls were there for an immoral purpose and refused to serve them.

The following agreement was introduced into evidence,

"It is agreed that H. W. Woodward and W. E. Drysdale are to remain with purchaser for a period of thirty days at bar tenders' wages. Date of possession to be April 1, 1953."

Elkind did not take possession until May 13. Evidence was introduced to show the purpose of the agreement was for the partners to introduce Elkind to the regular customers as the new owner and to teach him to mix drinks. The partners did not stay for 30 days after possession but left on May 13. They did not stay for 30 days after possession as Elkind told them he was keeping the same help and therefore it would not be necessary for them to remain. Testimony showed Elkind had been behind the bar on many occasions before May 13th and that he had been introduced to the regular customers as the new owner. This was denied by appellant. The briefs have not raised a question concerning this agreement.

The findings of the trial court state that defendants did with intent to induce plaintiffs to purchase said business represent that the bar was grossing $10,500 per month; that it is not true that plaintiffs believed or relied on any such representations nor were they induced to purchase the bar by any such representations.

To maintain an action based on fraud it is necessary to prove reliance upon the alleged misrepresentation. (*John-*

*ston* v. *Johnson,* 127 Cal.App.2d 464 [274 P.2d 1] ; *Arendt* v. *McConnell,* 41 Cal.App. 511 [183 P. 202].) The burden of proving this reliance is upon the party claiming fraud. (*Dotson* v. *International Life Ins. Co.,* 89 Cal.App. 653 [265 P. 357] ; *White* v. *Hayward,* 33 Cal.App. 550 [165 P. 972] ; *King* v. *Miller,* 97 Cal.App.2d 702 [218 P.2d 554].)

Appellant attacks the findings of the trial court by stating that there is insufficient evidence to support them, that they are inconsistent and they do not support the judgment. ▮ As has frequently been stated : ''It is fundamental that where the record discloses any substantial evidence in support of findings or verdict, an appellate court will not attempt an evaluation of the evidence.'' (*Eggleston* v. *Liberty Mutual Ins. Co.,* 144 Cal.App.2d 302 [300 P.2d 867]. See also *Doran* v. *Dreyer,* 143 Cal.App.2d 289 [299 P.2d 661].)

▮ Appellant contends that a vendee will not be barred from recovery when the vendor has acted in a manner as would reasonably induce a vendee to discontinue an investigation. ▮ Several cases are cited in support of this position. *Williams* v. *Meyers,* 110 Cal.App. 265 [294 P. 61], is cited for the proposition that before an investigation precludes a person's right to rely on the representations it must be a free and untrammeled one. While this is a correct statement of law, the case is distinguishable. The parties exchanged land. Plaintiff lived in California and defendant in South Dakota. The plaintiff was unable to obtain independent information concerning the land and could not bear the expense of a trip to South Dakota. He informed the defendant of this in his letters and stated he would have to rely on the defendant's statements as to the land's value. The correspondence showed the defendant continually overstated the value and pressured the plaintiff into making the exchange by threatening to accept another offer unless the exchange was made by a certain date.

The court stated on page 283 :

''The fraudulent representation must be such that the court can say that without it the contract would not have been entered into. (*Craig* v. *Shea,* 45 Cal.App. 351 [188 P. 73], and cases there cited.)''

In *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958], in order to obtain the true facts it would have been necessary to make a complete examination and appraisal of all the company's assets which included numerous and varied hold-

ings. The company was a family corporation, the stock not being sold on the open market; therefore, the judgment had to be made by one familiar with the facts. Appellant quotes the following rule from the case at page 435:

"A defrauded person, however, is not barred from maintaining an action merely because he commenced an investigation if it was incomplete or abandoned before discovery of the falsity, particularly if the defendant has superior knowledge of the facts, or if it is difficult for the plaintiff to ascertain all the facts or he is not competent to judge the facts without expert assistance."

In the instant case the investigation was not abandoned before he discovered the falsity nor so incomplete that he did not discover the misrepresentations. Dunlap's testimony showed appellant was told the gross was about $6,500 per month. Price testified he had told Elkind he could form no opinion as to the actual gross, but there was no prima facie evidence showing a gross of $10,500 and the sales tax receipts showed $6,000-$6,800. Elkind was familiar with sales tax receipts having made them out in his previous businesses.

Appellant has also cited *Sime* v. *Malouf*, 95 Cal.App.2d 82 [212 P.2d 946, 213 P.2d 788]. There the concealment was of highly material facts peculiarly within the defendant's knowledge and which could not have been discovered by the plaintiff. The court stated, concerning the rule of constructive notice, at page 106:

" '. . . the rule imputes notice only of those facts that are naturally and reasonably connected with the fact known, and of which the known fact or facts can be said to furnish a clue. . . .' "

It is argued respondents' actions sidetracked appellant's investigation by allowing him to make daily deposits and by listing the daily sales for a 10-day period. Appellant is a man with considerable experience in the business field. Two accountants testified they had gone over books of other bars for him. With such a background it is unlikely appellant would rely on a listing of 10 days' sales as showing the bar's gross. It is equally unlikely he would have so easily allowed the known discrepancy to be explained away if he intended to purchase the bar solely because of its gross.

Here, respondents continued to misrepresent the same material fact and did not try to increase appellant's confidence by making good a known falsity. They tried to explain away a discrepancy, not correct it. They allowed appellant to make out deposit slips, to visit the bar and to serve customers.

Appellant could see the type and amount of liquor being served in the bar for three months before he purchased it.

Appellant's next contention is that when the investigation by the vendee is prevented by the vendor, the vendee has a right to rely on the statements by the vendor.

Appellant cites as authority for the above rule, *Koch* v. *Rhodes,* 57 Mont. 447 [188 P. 933], a case where the plaintiff purchased a tract of land and did not examine it because he was told it would be necessary to have rubber boots to go into the meadow. In *Palladine* v. *Imperial Valley Farm Lands Assn.,* 65 Cal.App. 727 [225 P. 291], the seller took advantage of a fraternal relationship. Plaintiff asked him, as a Mason, if the representations were true and defendant replied yes. The plaintiff did go on the land but was partly blind and did not get out of the car. In *Riverside Rancho Corp.* v. *Cowan,* 88 Cal.App.2d 197 [198 P.2d 526], the plaintiff paid so much per acre for flat land and a great deal less for hilly land. Since the tract contained 300 acres it was impossible for an inexperienced person to tell by a mere inspection how many acres there were of each class. It was held that since the plaintiff paid so much per acre there was a failure of consideration. In *Wainscott* v. *Occidental Bldg. & Loan Assn.,* 98 Cal. 253 [33 P. 88], the court comments on the many artifices resorted to to prevent an examination.

Appellant then contends that when a vendor lulls a suspicious buyer into a false security, the buyer has not lost his right to rely on the seller's misrepresentations. He argues the only information available to him was the false statements by respondents since the investigation was incomplete and inconclusive. He correctly quotes *Hanscom* v. *Drullard,* 79 Cal. 234 [21 P. 736] ; *Kalkruth* v. *Resort Properties, Ltd.,* 57 Cal. App.2d 146 [134 P.2d 513] ; and *Blackman* v. *Howes,* 82 Cal. App.2d 275 [185 P.2d 1019, 174 A.L.R. 1004], in support of this argument. However, in the Blackman case the court stated at pages 278 and 279 :

"When the facts are susceptible to opposing inferences, whether a party relied upon a false representation, notwithstanding prior information which, if investigated, might have led to discovery of the falsity of the representation, is itself a question of fact to be determined by the trier of fact."

Appellant further argues that the "negligence of the buyer is no defense where the seller's misrepresentations were intentional." *Hefferan* v. *Freebairn,* 34 Cal.2d 715 [214 P.2d 386] and *Eichelberger* v. *Mills Land & Water Co.,* 9 Cal.App. 628

[100 P. 117], are cited as support. In the Hefferan case it was necessary for the plaintiff to examine the defendant's books and the court pointed out on page 720:

"The misrepresentations of earnings in the present case fall into a category for which the Carpenter case makes a specific exception, i.e., 'that a buyer is not required to employ experts to investigate matters of a technical nature as to which the seller has full knowledge and the buyer none, and if for this reason the investigation is incomplete, he may show that he relied upon the representation as to matters which he did not investigate.' . . . another exception specified in the Carpenter case applies, namely, that a buyer is not chargeable with knowledge of conditions that he fails to discover because of some artifice or deception of the seller."

In the case at bar plaintiff did employ several bookkeepers to look over the records and talked with the defendants' bookkeeper. The court in the Hefferan case also stated at page 719:

" 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' . . . If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery."

The defendant in the Eichelberger case misrepresented the extent of land sold. The court held that the mere existence of opportunities for examination or of sources of information was not sufficient even though there were circumstances that would have aroused their suspicion. The actual amount of land could only have been ascertained by scientific measurements and plaintiff is not required to hire an expert.

The above cases may be distinguished from the case at bar. The facts show the necessary information was readily available to the plaintiff. The defendants were willing to supply any needed material and the investigation proceeded without hinderance. However, the facts show that appellant did make an independent investigation and the evidence is sufficient to show that he did acquire sufficient information concerning the gross of the bar to at the very least put him on notice of the discrepancy.

Respondents next contend that a party who has knowledge of suspicious circumstances is put on notice and required to make a diligent inquiry.

Respondents quote from *Cameron* v. *Cameron*, 88 Cal.App. 2d 585 at page 594 [199 P.2d 443]:

"If he becomes aware of facts that tend to arouse his suspicion, or if he has reason to believe that any representa-

tions made to him are false or only half true, it is his legal duty to complete his investigation and he has no right to rely on statements of the other contracting party."

In *Lady Washington Consol. Co.* v. *Wood,* 113 Cal. 482 [45 P. 809], the transactions were open and public and the record could have been inspected by anyone. In *Simpson* v. *Dalziel,* 135 Cal. 599 [67 P. 1080], the plaintiff could have learned the true facts by asking his attorney. The plaintiff in *First National Bank* v. *Thompson,* 212 Cal. 388 [298 P. 808], not only had knowledge of facts which should have put him on inquiry, he had actual knowledge of the fraudulent circumstances before he entered the agreement.

Respondents cite *Merchants' Ice etc. Co.* v. *Globe Brewing Co.,* 78 Cal.App.2d 618 [177 P.2d 963], where the court states at page 624:

" 'As the means of knowledge are equivalent to knowledge if it appears that the plaintiff had notice or information of circumstances which would put him on an inquiry which, if followed, would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have had actual knowledge of these facts.' This rule applies where failure to make inquiry under the circumstances would amount to a negligent omission. (*Tarke* v. *Bingham,* 123 Cal. 163 [55 P. 759].)"

It is our view that the appellant made a sufficient investigation and found information which put him on notice of the actual facts.

Appellant has argued that the findings of the trial court are inconsistent because the only information available to him was the false representations made by respondents. The evidence shows appellant worked at the bar, knew the sales tax returns and was told by the defendants' bookkeeper that the bar grossed approximately $6,500. There was evidence showing appellant desired to change the type of patronage. This tended to show appellant's primary interest was not the gross of the bar but rather its potentiality and that he would be more concerned with the location, facilities, etc.

Appellant appears to be arguing that he relied as a matter of law on the representations. ▮ Reliance is a question of fact. ▮ The trial court found, under the facts of this case, that appellant did not rely on the representations and the evidence is sufficient to sustain the decision.

Judgment affirmed.

Dooling, J., and Draper, J., concurred.