[Crim. No. 2. Fourth Appellate District.—November 15, 1929.]

THE PEOPLE, Respondent, v. DEW R. OLIVER, Appellant.

Theodore Stensland, Trent Penland and J. R. Le Gallez for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

MARKS, J.—By an information, filed by the district attorney of Riverside County on the twenty-third day of April, 1929, appellant was accused of violation of the Corporate Securities Act in nine counts thereof, and of grand theft in two counts thereof. Count eleven, charging grand theft, was dismissed. The jury found the appellant guilty on counts one, three, four, six, eight and ten, all of which charged violations of the Corporate Securities Act; and not guilty on counts two, five and nine, charging violations of the same act, and also not guilty on count seven, charging grand theft. After the verdict was entered appellant filed his motion for new trial, which motion was denied. He then applied for probation, which was granted on counts one, three, six, eight and ten, for the periods of two years with the ordinary requirements and restrictions, and pronouncement of judgment was suspended. On count four, the trial court sentenced appellant to two years in the county jail and granted him probation in which he suspended one year and nine months of the jail sentence, and imposed the other conditions of probation applying to the other counts. The offenses of which the appellant was convicted were committed during the months of May, June and July, 1927.

Counts one and three of the information are based upon a transaction between appellant and Grant Powell, which is evidenced by a written contract, dated July 5, 1927, and entitled "Memorandum of Agreement for the promotion of The Oliver Electric Power Corporation of California or State of Delaware." Stripped of its verbiage this contract provided: That appellant was the owner of certain patents and patent rights; that it was proposed to organize a corporation to which appellant agreed to transfer and assign the exclusive right to use said patent rights for the state of California, retaining, as a consideration for such assignment, one-third of the capital stock of the corporation; in consideration of the payments of money to him by Powell, appel-

lant agreed to deliver, assign and cause to be transferred to Powell certain shares of stock of the corporation when organized, out of stock which appellant was to receive for his license to use the patent rights in California.

Powell paid Oliver $50 on July 5, 1927, the date of the contract, $50 on August 1, 1927, $50 on September 23, 1927, and $50 on October 16, 1927. According to the contract, the money was to be used by appellant in advertising the merits of his patents, organizing the corporation and interesting the public in the purchase of stock therein.

The contract bears the signature ''Dew R. Oliver by Frank S. Trump.'' Trump testified that he signed the name ''Dew R. Oliver'' to the contract in appellant's presence and at his express direction, and that the payments made by Powell were all paid to Oliver. Appellant contends that under these circumstances the signature to the contract is not his and that he cannot be held bound by it. In this state the law is too well settled to the contrary to need the citation of authorities.

In the first count of the information appellant is accused of having sold and issued to Powell one subscription agreement purporting to convey an interest in a business to be carried on for profit without a permit from the commissioner of corporations, and in the third with collecting the sum of $50 from Powell on said contract at the same time without having any permit so to do.

Counts four and six of the information probably are based upon a contract, signed by appellant and Frank S. Trump, different from the Powell agreement. The record is not clear as to whether this contract was similar to the Powell agreement or to the one issued by appellant to Josephine Roach Trump, wife of Frank S. Trump. The opening paragraphs of this agreement are as follows: ''Pre-organization Syndicate. Oliver Electric Power Corporation of Delaware. To be incorporated under the laws of Delaware. Capital Stock $25,000,000.00. Divided into 250,000 shares. Par value $100.00 each. Organization stock 82,500 shares. Syndicate stock 5,000 shares. Treasury stock 162,500 shares. This syndicate is being organized for the purpose of underwriting a block of five thousand shares of the capital stock of the above proposed company at ten dollars per share. To provide immediate funds for the incorporation,

organization and promotion of a parent holding and operating company, and the building of demonstration models, etc. Capital of Syndicate $50,000.00 divided into five thousand equal units of $100.00 each. Subscription contract to Dew R. Oliver . . . I hereby subscribe for thirty units, or shares, of the pre-organization syndicate being organized by you, to underwrite a block of five thousand shares of the capital stock of the proposed Oliver Electric Power Corporation of Delaware . . . and agree to pay you three hundred dollars for same upon the following express terms and conditions, to-wit: One. The sum of $300.00 upon the signing of this subscription, the receipt whereof is hereby acknowledged.'' The contract is long and verbose. It provides for the exchange of units for stock in the corporation, for additional subscriptions in excess of $300, and that all payments be made to Dew R. Oliver, syndicate manager. Trump made several payments to appellant, the one in question being paid on May 25, 1927.

The eighth and tenth counts are based on a sale to Frank Cessna on June 19, 1927. The Cessna contract was not in evidence, but he testified, without objection, that it was similar to the Powell contract, which he had read. He paid appellant $50 on the last-named date.

In the fourth and eighth counts of the information appellant is accused of the sale of securities to Trump and Cessna, respectively, and in the sixth and tenth counts, with the collection of money from these two purchasers in connection with the same sales and at the same time.

Appellant urges four grounds for reversal as follows: 1. That the evidence was insufficient to justify the verdict. 2. That the court erred in rulings on questions of law during trial. 3. That the court erred in its instructions to the jury, and in refusing to give, and in modifying the instructions proposed by appellant. 4. In denying appellant's motion for new trial. The grounds urged under the fourth assignment of error were the same as those presented under the other three, so it will not be necessary to consider it separately.

Under his first assignment of error appellant insists that the evidence was not sufficient to justify the verdict, because the three purchasers were the only witnesses produced

against him, and because the contracts issued by appellant were not in violation of the Corporate Securities Act.

The testimony of one competent witness, when accepted by the jury, is sufficient to sustain a verdict. The testimony of Powell, Trump and Cessna was each corroborated by the other and was also supported by documentary evidence and other evidence. It was not contradicted and amply supports the verdict.

We also conclude that appellant's second contention under this assignment of error is without merit. The Corporate Securities Act (Stats. 1917, p. 673, chap. 532), as amended by the legislature in various sessions down to and including the one in 1925 (Stats. 1925, p. 962, chap. 447), in so far as it applies to this case provides as follows:

Section 2, subdivision 3. "The word 'company' includes all domestic and foreign private corporations, associations, joint stock companies, and partnerships, of every kind, trustees, as hereinafter defined, and also individuals as hereinafter defined."

6. "The word 'individual' in so far as it is included in the definition of a 'company' includes only persons selling, offering for sale, negotiating for the sale of, or taking subscriptions for any security as hereinafter defined in subdivision eight of this section, of their own issue."

8. "The word 'security' in so far as it applies to 'individuals' includes: . . . (c) Any instrument offered for sale, or sold, or issued, to the public by an 'individual,' evidencing or representing any right to participate or share in the profits, earnings or income, gross or net, derived from the assets, or any thereof of any business carried on for profit or in the distribution of such assets; excepting therefrom any lease, not offered to the public, whereby the lessee obtains the right to use or control the property leased and to receive for his use, in whole or in part, the profits, earnings or income derived from the property so leased."

9. "A 'sale' within the meaning of this act includes every contract by which, for a pecuniary consideration, called a price, one transfers to another an interest in property, and also an exchange, a pledge, a hypothecation, and any transfer in trust or otherwise as security for the performance of an obligation, and also any issue of any security by a com-

pany; and the word 'sell,' as used in this act, includes every act by which such sale is made."

Section 3. "No company shall sell . . . or offer for sale, negotiate for sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it to do so."

Section 25. "Neither this act nor any provision hereof shall be deemed to prohibit subscriptions for shares of a domestic corporation made prior to the incorporation thereof set forth in the articles of incorporation; but such subscription shall be deemed to have been made and accepted upon the condition that such corporation shall be incorporated within ninety days thereafter and, when incorporated, shall with reasonable diligence apply for and secure from the commissioner a permit authorizing the issue of the shares so subscribed for, in accordance with such subscriptions; provided, however, that, except as may be specifically required by any law of this state, nothing herein contained shall be construed as permitting the collections of any portion of the consideration to be paid on account of such subscriptions, unless and until a permit shall have been issued by the commissioner authorizing such collection; nor except as may be specifically required by any law of this state, nothing herein contained shall be construed as permitting the taking of subscriptions for any security of any company other than a domestic corporation or to make collection of any portion of the consideration to be paid on account of subscriptions unless and until a permit shall have been issued by the commissioner authorizing the taking of such subscriptions or the collection thereof."

The record before us shows that the appellant stipulated that neither he nor the Oliver Electric Power Corporation ever applied for or received a permit to sell stock.

Appellant attacks the verdict under the Powell contract, asserting that he could not be deemed a "company" under the definition of the Corporate Securities Act, either by reason of acting as a "trustee" or an "individual" as therein defined. For the purpose of this opinion it is not necessary to decide whether or not appellant acted as a "trustee" in this transaction.

In the Powell contract appellant entered into a personal obligation to organize the Oliver Electric Corporation, to license this corporation to use his patent rights in California, and to issue and deliver certain stock in the corporation to Powell, which stock was to come out of certain stock to be issued to appellant by this corporation for the license to use the patent rights. Certainly this was an agreement of "appellant's own issue." He was the chief party to benefit by it if the patents proved successful. The contract was a preorganization subscription to the capital stock of a foreign corporation not set forth in the articles of incorporation, and under which appellant collected a "portion of the consideration on account of such subscription," both acts being prohibited by section 25 of the Corporate Securities Act.

Appellant contends that because the proposed corporation was not in existence, and might never be organized by appellant, no crime was committed in agreeing to sell its stock and accepting payment therefor. This is indeed a novel contention. If the corporation were formed and the stock were available, the sale without a permit would be admittedly illegal, but if the corporation were not formed the promoter would escape punishment because of his own fraud in refusing to organize it, one of the very things for which he accepted the money from his purchaser. We cannot subscribe to any such doctrine.

If the instrument of sale creates a present right to a present or a future participation in either the income, profits or assets of a business carried on for profit, it is a "security" as defined in the Corporate Securities Act. Because the interest created will not return a profit until the performance of a future act, such as the sale of an interest in a patent, or the grant to a licensee of the right to use it, does not bring it without the provisions of this act. (*Agnew* v. *Daugherty,* 189 Cal. 446 [209 Pac. 34].) To hold otherwise would make the real test of the legality or illegality of the sale the ultimate success or failure of the venture. The law was passed to protect the investors against unprincipled promoters, as well as to keep valueless securities off the market. It is the act of selling that is primarily placed under the examination of the commissioner of corporations, and his action in granting or withholding

his permit to sell cannot be made contingent upon the future success or failure of the business venture. To hold otherwise would put a premium on fraud and permit a promoter to sell a mythical security without any intention of ever attempting to engage in the business in which he purported to sell an interest.

Because the stock in a corporation was to be issued and delivered at a future date is no defense to this action (*Tatterson* v. *Kehrlein*, 88 Cal. App. 34 [263 Pac. 285]).

In the case of *Reno* v. *American Ice Machine Co.*, 72 Cal. App. 409 [237 Pac. 784, 785], the court used the following language: "No application to issue the stock attempted to be sold to plaintiff, and containing a copy of the contract for the sale thereof, was ever made to the commissioner of corporations prior to the commencement of this action, and it was never possible for defendant company to have lawfully issued its stock to plaintiff. That being true, we think it must follow that the contract for the sale of the same was void. Section 12 of the Corporate Securities Act provides that any security issued without a permit shall be void. But appellant contends that this provision does not apply to a contract for the sale of stock. Can it be contended seriously that while an executed contract forbidden by statute is void, the same contract, while executory, is valid? If the issuance of the stock to plaintiff during the term of his employment by the defendant would have been void, certainly the contract for the issuance of the same was equally void."

Appellant complains of the verdict on the two counts in the Cessna transaction because Cessna's contract was not produced in evidence. It appears that it could have been obtained by Cessna, but, without objection, counsel for appellant permitted him to testify that he had read the Powell contract and that his was similar to Powell's. Counsel cannot be heard to complain here for the first time that this secondary evidence was admitted in the trial court when by objection there they could have kept it out of the record and compelled the introduction of the written agreement.

It appearing that the Cessna contract was similar to Powell's it will not be necessary to consider it further. The same is true of the Trump contract if the Powell form was used. If, however, the form of the contract between appel-

lant and Mrs. Trump were used, it needs further consideration. In so far as this contract provided for the purchase of stock in the Oliver Electric Power Corporation, by Trump and others from Oliver, what has already been said concerning the Powell contract will apply.

This contract went further than the Powell contract in that it purported to organize a syndicate, with a capital of $50,000, divided into 5,000 equal units of $100 each. The contracts were signed by appellant and the subscriptions were paid to and expended by him. The syndicate was a child of his brain and the contracts were of his own issue. He undoubtedly expected to profit by the undertaking by using the money paid to him by the subscribers, to build demonstration models of his invention and to organize, incorporate and promote the corporation that would put his invention to practical use in the industrial life of the state. The subscribers undoubtedly expected to share these profits in participating in stock of the corporation which they were to receive at a price much below par.

This syndicate possessed all of the necessary characteristics of a "company" as defined in the Corporate Securities Act. It had a capital stock of $50,000, divided into 5,000 units of the par value of $100 each, which were sold in blocks of thirty for $300, and were exchangeable on the basis of one unit for ten shares of the capital stock of the Oliver Electric Corporation of Delaware. The mathematics of the proposed transfer were not carefully worked out by appellant. According to his contract he proposed to set aside only 5,000 shares of the corporate stock with which to effect the exchange when 50,000 shares would have been necessary. This, however, only changes the amount to be received by the subscribers, and not the general plan of operation which must control. If a unit issued by an individual represents a division of the assets of a business carried on for profit, or in the distribution thereof, or the right to participate in the profits, earnings or income derived from such assets, it is a security under the definition of subdivision 2, section 8, of the Corporate Securities Act. (*In re Gerard*, 186 Cal. 718 [200 Pac. 593].) "While the term 'capital stock' is often used in the sense of the amount derived from the issuance of shares in a corporation, still its signification is by no means limited to that definition. On

the contrary, it has been defined to be 'money invested in business operations, whether that business is conducted by a single individual, partnership, corporation or government.' (9 C. J., p. 1280.) It has been said to be 'the amount fixed by partners or their associates as their stake in the concern' (*Hightower* v. *Thornton*, 8 Ga. 486 [52 Am. Dec. 412]) ; also as the fund or property belonging to a firm or corporation and used to carry on its business. (*Sanger* v. *Upton*, 91 U. S. 56 [23 L. Ed. 220].)'' (*People* v. *Main*, 75 Cal. App. 471 [242 Pac. 1078, 1081].)

Under his second assignment of error appellant complains of the introduction in evidence of an exemplified copy of the articles of incorporation of the Oliver Electric Power Corporation, a Nevada corporation. Articles of incorporation were filed in Nevada on July 9, 1928. The record does not show that appellant had any direct connection with the organization of this company. The Powell contract was headed ''Memorandum of Agreement for the promotion of the Oliver Electric Power Corporation of California or State of Delaware,'' and provided for the organization of the corporation. Some time after July 10, 1928, Powell received a certificate of stock in the Nevada corporation through the mail. The same general state of facts applies to the Trump and Cessna cases, except that under the Mrs. Trump contract the corporation was to be organized under the laws of the state of Delaware. The name of the corporation organized was identical with the one set forth in the contracts except the state of its domicile, and its purpose and powers were the same. Appellant promised the three purchasers stock in the Oliver Electric Power Corporation of either California or Delaware, and they received stock in the Oliver Electric Power Corporation, a Nevada company. We believe that the objection of appellant went more to the weight and sufficiency of the evidence than to its admissibility and that the trial court properly submitted the same to the jury.

The instructions given by the trial court complained of by appellant correctly paraphrased the sections of the Corporate Securities Act quoted in this opinion. The instructions of the trial judge and his rulings on questions of law during the trial were fair to the defendant and we can find no error in them.

▉ Appellant contends that the verdicts of not guilty under counts two, five and nine of the information are inconsistent with the verdicts of guilty on counts one and three, four and and six and eight and ten of the information. Counts two, five and nine charged appellant with selling and issuing a security of the Oliver Electric Power Corporation to Powell, Cessna and Trump, respectively, while, as we have seen, counts one, four and eight of the information charge him with selling and issuing subscription agreements to the same persons, and counts three, six and ten with collecting money therefor. In this case, if any corporate security was sold by appellant it was the stock of the proposed corporation.

Where a promoter conceives a plan to obtain money from others for his own use in advertising the merits of patents secured by him, in organizing a corporation to put them into operation in a single state, and in interesting the public in the purchase of the corporate stock, and issues a contract over his own signature purposing to do these things, the contract itself forms a security of his own issue, even though it offers to the subscriber shares of stock in the corporation to be organized, as it goes beyond the mere sale of stock in the proposed corporation. In the sale of corporate stock the original price goes, or is supposed to go, into the treasury of the corporation, less permitted expenses of sale. In the instant case the money went into the pockets of the promoter, not only to defray the expenses of the organization of the corporation, but to make possible the very marketing of his patent rights, not only in California, where the corporation was presumed to operate, but in any other place that might be chosen by him. If the promotion had been successful and the invention of practical value, the profits from the sale of the patent rights or the licensing of their use in any place outside of the state of California would have gone to appellant in their entirety. No subscriber would have had any claim thereon. The fact that the subscriber was to receive shares of stock of the corporation does not make the transaction one of the mere sale of the corporate stock which was but one of its incidents. The security sold was one of the issue of appellant himself and not of the Oliver Electric Power Corporation. Such being the case, the verdict of not guilty of the charge of the sale of the corporate security is not inconsistent with the verdict of guilty of the

sale of the security issued by appellant. (*People* v. *Day,* 199 Cal. 78 [248 Pac. 250]; *People* v. *Vanderbilt,* 199 Cal. 461 [249 Pac. 867].)

Appellant urges with great earnestness that counts one, four and eight of the information charge three several sales of securities, and that counts three, six and ten charge collection of money from each respective purchaser at the time and place of the sale and therefore constitute a part and parcel of the one transaction; that therefore each sale, and the collection of money therefor, constituted but one offense, for which but one penalty could be inflicted. He cites the case of *People* v. *Clemett,* 208 Cal. 142 [280 Pac. 681], decided on September 14, 1929, in support of this contention.

In the case of *People* v. *Clemett, supra,* the information contained two counts, which the Supreme Court held were based upon but one offense. The jury returned separate verdicts of guilty on both counts and the trial court sentenced the defendant on both. The Supreme Court affirmed the judgment on one count and reversed on the other. The vice is not the charging of the offense in two counts, but in judgment and sentence on both, thereby inflicting double punishment for one offense. In the case before us the trial court suspended the pronouncement of judgment on all five counts and imposed sentence in one. In each case the two offenses charged relate to the same transaction, and neither is inconsistent nor repugnant to the other. Should the appellant violate his probation and be brought back into court for sentence we will assume that the trial judge will follow the doctrine of *People* v. *Clemett,* if it applies to this case. Appellant has suffered no injury from the returning of verdicts on the various counts of the information (*People* v. *Vanderbilt, supra*). We cannot anticipate error on the part of the court below.

Judgment affirmed.

Sloane, P. J., and Barnard, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 14, 1929.