[Civ. No. 8921. Second Appellate District, Division One.—May 24, 1935.]

CALIFORNIA WESTERN HOLDING COMPANY, LTD. (a Corporation), et al., Appellants, v. R. D. MERRILL et al., as Executors, etc., Respondents.

Frank James and Everett H. Mills for Appellants.

Guy T. Graves, Bradner W. Lee, Jr., and Forrest F. Murray for Respondents.

David R. Faries and McIntyre, Faries and J. Clifford Argue, as *Amici Curiae* on Behalf of Respondents.

ROTH, J., *pro tem.*—This is an appeal from a judgment of dismissal, entered after an order sustaining a demurrer without leave to amend, and from an order denying a motion for leave to amend. The complaint is based upon "subscription agreement for shares of stock of proposed corporations . . . " dated January 15, 1929, which will hereafter for convenience be referred to as agreement. The agreement set up a management committee, which was empowered to fill any vacancies occurring in the membership of the committee, and to incorporate the two companies therein provided for, and to do and perform all acts and things necessary to effectuate the purpose thereof.

The agreement recites that it is proposed to create two corporations, the first to be known as California Western Holding Company, a California corporation, and the second, the Ritz Carlton Hotel Company of Los Angeles, a Delaware corporation, which corporations will for brevity hereinafter be called Holding Company and Operating Company, respectively. The Holding Company was to be organized under the laws of the state of California with a capital stock structure of 14,000 shares of common stock at $100 par value for each share, the management committee was authorized to name the number of directors of this corporation from among the subscribers to the agreement or other persons,

the Holding Company was then to acquire certain property, which will be referred to as the Krotona Hills site, and after the acquisition thereof, to construct thereon an hotel. The Operating Company was to be organized under the laws of the state of Delaware, the board of directors to be named by the management committee in the same way as that of the Holding Company, with a capital stock structure of 37,500 shares divided into 12,500 preferred of a par value of $100 with cumulating dividends of 8 per cent per annum and other inviting features, and 25,000 shares of common without par value.

The agreement proceeds to recite that the Operating Company will thereupon lease the hotel from the Holding Company, furnish and equip the same and negotiate an agreement for the actual management of the hotel with the Ritz Carlton Management Corporation, a New York corporation, under license from the Carlton Investing Company, a Delaware corporation. It will be observed, and the agreement does in fact so recite, that the objective of the management committee was to build an hotel on the Krotona Hills site that would be a part of the Ritz Carlton chain of hotels.

In the agreement, it is proposed to sell to and the subscribers thereto contract to buy units of stock comprising one share of the stock of the Holding Company and one share of the preferred and one share of the common stock of the Operating Company for $170 per unit, payable 20 per cent each at intervals "of not less than six months on demand of the treasurer or other authorized person pursuant to resolution of the boards of directors . . . " The units so sold were subject to the agreement made by the Operating Company and the Ritz Carlton Management Corporation to place 5,000 shares of the common stock of the Operating Company, together with an additional 10,000 shares of the same stock, which was to be issued to the Ritz Carlton Management Corporation, in a voting trust. Thereafter, provisions were made for issuance, indorsement and delivery of the stock contracted to be purchased by the various subscribers to a depositary for a period of one year, giving the right to each subscriber to sell during the year at certain prices, to join a pool, or to withdraw the stock, all on certain conditions the specific nature of which is not material.

The agreement further recites that the subscribers thereto "in consideration of their mutual promises, do severally agree to and with each other and *with said Holding and Operating Companies* that they will take and pay for, and that they do hereby severally subscribe to . . . the number of units set opposite their respective names . . . at $170 per unit . . . " It is also provided that any subscriber may withdraw his subscription, if, within one year after February 1, 1929, 8,000 units shall not have been "subscribed for, or otherwise disposed of". Finally, it is provided, "subscriptions are subject to the approval of the Commissioner of Corporations of the State of California".

The complaint, to which a demurrer was sustained without leave to amend, alleges that the management committee, together with divers other persons and corporations, who executed the agreement, associated themselves together for the purpose of consummating the object of the agreement, and that the defendant Don Lee was one of those persons, and subscribed for 74 units at a total purchase price of $12,580; that the subscriptions taken were made between January 15, 1929, and December 18, 1929, and that on December 18, 1929, more than 8,000 units had been subscribed for. The exact date of these subscriptions is not alleged in the original complaint (although in the amended complaint the date of defendant Lee's subscription is set out as July, 1929), and while the terms of purchase are alleged as recited in the agreement, it is not alleged whether or not defendant Lee paid the first 20 per cent of the purchase price upon the date of execution of the subscription, the only allegation in this respect being that a payment was made by Lee "on or about May, 1931," in the amount of $2,516. It is alleged that the management committee caused the organization of the Holding Company, and that its articles of incorporation were filed October 4, 1929, with the Secretary of State, and a certified copy thereof filed with the county recorder of Los Angeles County on October 7, 1929. The object, capital structure and official personnel of the Holding Company is then set forth, followed by an allegation that the Holding Company has carried on and is carrying on the business contemplated by the agreement. Then follow allegations reciting the incorporation of the Operating Company in Delaware on January 13, 1930, filing of the articles of incorpora-

tion with the Secretary of State of California on April 1, 1930, and the filing of a copy thereof with the county recorder of Los Angeles County on April 5, 1930, and also that a resident agent for the service of process and as otherwise required by law was designated, such designation being filed with the Secretary of State of California. Appropriate allegations follow showing the object, capital stock structure, election of its board and official personnel, and that it is now and at all times to date has been carrying on the business contemplated by the agreement.

The acceptance by the companies and the succession to the agreement is then recited, although the exact or approximate date is not alleged, followed with allegations that in reliance thereon, the Holding Company purchased the Krotona Hills site and additional lands contiguous thereto ''to secure a better site for said hotel''; that payments had been already made thereon and that in order to pay the balance it was necessary to obtain the balance of the money due on subscriptions made by the various subscribers in the agreement.

The complaint further alleges that on June 30, 1930, the Operating Company agreed with the Ritz Carlton Management Corporation of New York and the Carlton Investing Company of Delaware, pursuant to which permission was received to use the names Ritz and Carlton singly or in combination, and whereby the New York corporation undertook to manage the hotel for a period of twenty-one years with a renewal privilege of twenty-one years more. The issuance of the 5,000 shares of the capital stock of the Operating Company for purposes of a voting trust is then alleged, as provided for in the agreement, although nothing is said about the 10,000 shares of stock which were to be issued to the Ritz Carlton Management Corporation and placed in a voting trust as required in the agreement. It is then alleged that on December 19, 1929, the management committee had issued to members thereof a permit by the commissioner of corporations, authorizing the committee, as trustee, to offer for sale, negotiate for sale, and take subscriptions for shares of stock of the Holding Company and Operating Company in units, as provided for in the agreement, not to exceed 8,790 units at $170 per unit, and to collect not to exceed 20 per cent of the sale price thereof. Nothing is alleged as to

what, if anything, the permit provided as a mode of calling the balance. The permit is not made a part of the complaint, other than by the pleading of certain of its terms, and from the method of its allegation, the only conclusion which can be drawn is that the permit was issued to permit future subscriptions and said nothing about those already taken. Allegation is then made that on August 6, 1930, the commissioner of corporations on application of the Holding Company and the Operating Company "issued his supplemental permit to said respective . . . corporations to sell and issue to the persons recited in said permit, which included the subscribers to said agreement of January 15, 1929, not to exceed 8,790 shares" of both companies in units, as provided for in the agreement, for cash or 20 per cent cash and the balance in cash instalments payable in two years from date. On May 20, 1932, it is alleged that the commissioner of corporations amended the previous permits extending the period thereof from August 6, 1932, to August 7, 1933. The allegations show that a total of $5,032 was paid by defendant Lee on his subscription, and it is definitely alleged that one payment of $2,516 was made in May, 1931, which appears to be the first payment; when the second was made does not appear. Allegations are made concerning the holding of directors' meetings, the passing of resolutions at the same relative to the call for additional instalments, the making of said additional calls and the persistent refusal of defendant to heed the same, and that they were not heeded; that no other sums were paid and that $7,548 remained due on the subscription and that no part of it was paid.

There is a second cause of action in form of *assumpsit,* predicated upon and alleging the agreement referred to, alleging an unpaid balance of $7,548 on the subscription of the defendant Don Lee, that no part of said balance has been paid, and requesting judgment for that amount.

At the time respondent made his subscription, the portions of the Corporate Securities Act which are of immediate relevancy to the situation presented, were section 25, section 2, subdivisions 3, 4 and 5; section 2, subdivision 7, paragraphs (a) and (d) and subdivision 9, and sections 3, 12, 13 and 14.

All references to the Corporate Securities Act made herein are made to the act as it existed at the time the subscription agreement in question was executed, to wit: The

Corporate Securities Act, as amended to and including 1927. The pertinent portion of section 25 is as follows: "Neither this act nor any provision hereof shall be deemed to prohibit subscriptions for shares of a domestic corporation made prior to the incorporation thereof and set forth in the articles of incorporation; but such subscription shall be deemed to have been made and accepted upon the condition that such corporation shall be incorporated within ninety days thereafter, and, when incorporated, shall with reasonable diligence apply for and secure from the commissioner a permit authorizing the issue of the shares so subscribed for, in accordance with such subscriptions; . . . nor except as may be specifically required by any law of this state, nothing herein contained shall be construed as permitting the taking of subscriptions for any security of any company other than a domestic corporation nor to make collection of any portion of the consideration to be paid on account of subscriptions unless and until a permit shall have been issued by the commissioner authorizing the taking of such subscriptions or the collection thereof."

A mere reading of the foregoing excerpt demonstrates that three conditions precedent were at that time required to make valid a preorganization subscription to the stock of a domestic corporation, i. e.: 1. Setting it forth in the articles of incorporation; 2. Completing the incorporation of the company within ninety days after subscription is taken; 3. Making application to the commissioner of corporations for a permit to issue stock in accordance with the preorganization subscription within a reasonable time after incorporation.

The decisive questions on this appeal are: First, whether the agreement, the terms of which have been substantially outlined, is a preorganization subscription agreement within the meaning of section 25 of the Corporate Securities Act; and second, if it is, has the conduct of the parties, as pleaded in the original complaint or in the proposed amended complaint which will be treated hereinafter in more detail, created a new valid agreement, binding upon the parties under the doctrine announced in *Moore* v. *Moffatt*, 188 Cal. 1 [204 Pac. 220].

Appellants contend that the agreement is not one within the purview of section 25, but rather a preliminary agreement for the organization of conventional corporate agencies to

be utilized by the parties for the construction and operation of an hotel under an arrangement by which units of stock of the corporation are to be issued after a permit has been obtained to evidence their respective contributions to the hotel project as members of a syndicate; that considered as such, it is not a subscription for ''securities'' as defined by the Corporate Securities Act, but a transaction by which the persons who signed the agreement provide the method of giving back to themselves certificates for shares of stock in the companies to be subsequently organized, to be issued under a permit of the commissioner of corporations as paper evidence of their interests in the enterprise.

There may be some distinction between a preorganization subscription agreement, as contemplated by the Corporate Securities Act, and the type of agreement which appellants have defined as above, and which they assert is the kind of transaction involved in the instant case. If there is such a distinction, it is of so nice and refined a nature that it might have been a subject for debate for the schoolmen of the middle ages, but it can hardly be said to be of any particular utility in the field of corporate activity of this day. ■ Almost every preorganization subscription in which a number of parties join is a preliminary agreement utilized by its signatories for the formation of a corporation for purposes which are either set out or kept out of the agreement, and no stock can be legally issued until a corporation is formed, and a permit obtained, and when the stock is so issued, it represents the proportionate shares of the subscribers in the corporate enterprise; but the mere fact that the corporation has been regularly formed and that the permit to issue stock has been regularly obtained, and that the stock so issued accurately reflects the share of the subscriber in the corporate enterprise, does not make a preorganization subscription anything but a preorganization subscription, nor will these factors make such a subscription valid unless all the requirements of the Corporate Securities Act with reference to such subscriptions have been complied with.

In our opinion the agreement in question must be construed as a preorganization subscription agreement within the scope of the Corporate Securities Act. The parties themselves have called it a ''subscription agreement'', its language and terms make it apparent that it is a subscription agree-

ment irrespective of its title, and finally case construction of similar agreements as well as definitions of terms set forth in the Corporate Securities Act, brand it with finality as such. (*Olds* v. *Simmons,* 123 Cal. App. 275 [11 Pac. (2d) 36] ; *People* v. *Oliver,* 102 Cal. App. 29 [282 Pac. 813] ; *People* v. *Claggett,* 130 Cal. App. 141 [19 Pac. (2d) 805] ; *Johnson* v. *Hulse,* 83 Cal. App. 111 [256 Pac. 551] ; *First National Bank of Calexico* v. *Thompson,* 212 Cal. 388 [298 Pac. 808] ; *Castle* v. *Acme Ice Cream Co.,* 101 Cal. App. 94 [281 Pac. 396] ; *Black* v. *Solano Co.,* 114 Cal. App. 170 [299 Pac. 843] ; *Rossi* v. *Jedlick,* 115 Cal. App. 230 [1 Pac. (2d) 1065] ; *Klombies* v. *Weeks Poultry Community,* 121 Cal. App. 175 [8 Pac. (2d) 940] ; *Herkner* v. *Rubin,* 126 Cal. App. 677 [14 Pac. (2d) 1043] ; *Harlie R. Norris Co., Ltd.,* v. *Lovett,* 123 Cal. App. 640 [12 Pac. (2d) 141] ; *Union Bank & Tr. Co.* v. *Joyner,* 40 Ariz. 229 [11 Pac. (2d) 829].) █ Our courts have uniformly held that these conditions of section 25 must be complied with when such agreements are made, and that a failure to conform to any of them invalidates the subscription. (See cases, *supra.*) In the case of *Herkner* v. *Rubin, supra,* the court says, at page 679 : ''Here the findings show a lapse of 143 days from the date of the subscription agreement to that of incorporation, and also that the articles of incorporation failed to recite the facts of defendant's subscription.

''It has been held that under such circumstances the statute becomes a part of the subscription agreement, and unless the conditions are complied with a subscription agreement is not enforceable. . . . ''

█ Furthermore, section 25 grants permission to take subscription agreements in domestic corporations only. No permission or right to take such subscriptions to the stock of foreign corporations is pleaded, nor is any given by statute and such preorganization subscriptions are void (*Olds* v. *Simmons, supra; People* v. *Oliver, supra*) ; and there is nothing unconstitutional in the right of the legislature, as appellant contends, to regulate the sale of securities of a foreign corporation in this state. (*Gillis* v. *Pan American Western Petroleum Co.,* 3 Cal. (2d) 249 [44 Pac. (2d) 311].)

█ The complaint affirmatively shows that the incorporation of either corporation did not take place for more than ninety days after the subscription of the respondent. It was

incumbent on the pleader to affirmatively plead the incorporation within ninety days. (*San Francisco Sav. Union* v. *Reclamation District,* 144 Cal. 639, 645 [79 Pac. 374] ; *Thompson* v. *San Francisco Gas etc. Co.,* 20 Cal. App. 142 [128 Pac. 347].) The complaint fails to plead that the subscription of respondent was listed in the articles of incorporation. Therefore, it will be presumed that respondent Lee's subscription was not, nor were those of any of the other preorganization subscribers set forth in the articles of incorporation. These elements are required and must be pleaded. (*Rossi* v. *Jedlick, supra,* pp. 234, 235.)

The pleadings affirmatively show that the permit was not issued to either corporation, as distinguished from the original committee mentioned in the agreement, until August 6, 1930. The date of the agreement was January 15, 1929, and of respondent Lee's subscription, July, 1929. On the facts as pleaded, this was too long a delay. (*Herkner* v. *Rubin, supra; Rossi* v. *Jedlick, supra; First National Bank of Calexico* v. *Thompson, supra.*)

The agreement provides for the issuance and sale of securities either by the companies to be formed, since a preorganization subscription is a security (Corporate Securities Act, sec. 3 and sec. 12), or by the management committee which it sets up. In either event, the securities so issued and sold are void for lack of compliance with the Corporate Securities Act. Under subdivision 3 of section 2, the word "company" is defined to include trustees, and subdivision 4 of the same section specifies "trust" as including all voluntary trusts, as the same are defined in the Civil Code. (Civ. Code, secs. 2216 et seq.) Section 2219, Civil Code, provides: "Everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee, within the meaning of this chapter, not only as to the person who reposes such confidence, but also as to all persons of whose affairs he thus acquires information which was given to such person in the like confidence, or over whose affairs he, by such confidences, obtains any control."

A security is defined by paragraph (a), subdivision 7, of section 2, as follows: "(a) All shares or other interests or rights into which the capital, capital stock, or property of companies or rights of stockholders or members thereof are divided, including all treasury shares and shares of their

own capital stock purchased or otherwise acquired by companies upon delinquent assessment sales or in any other lawful manner, and all certificates and other instruments issued by them or their authority, evidencing or representing such shares, interests, or rights; . . . '' This definition is further elaborated by paragraph (d) of the same subsection. Subsection 9 of the same section 2 defines sales so as to include the transfer of ''an interest in property . . . and also any issue of any security by a company''. Section 3 of the act prohibits any company to ''take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit . . . '' Section 25, already referred to, creates an exception to this requirement, but only on the conditions set forth in that section.

Section 12 of the act provides: ''Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void, and every security issued by any company, with the authorization of the commissioner but not conforming in its provisions to the provisions, if any, which it is required by the permit of the commissioner to contain, shall be void.''

It is settled that trustees named in a preorganization agreement with powers to organize a corporation and collect funds are trustees of an express trust. (*West* v. *Crawford,* 80 Cal. 19 [21 Pac. 1123] ; *Reno* v. *American Ice Machine Co.,* 72 Cal. App. 409 [237 Pac. 784] ; *People* v. *Oliver, supra; People* v. *Claggett, supra; Ross* v. *Silent Drama Syndicate,* 82 Cal. App. 109 [255 Pac. 225] ; *Agnew* v. *Daugherty,* 189 Cal. 446 [209 Pac. 34] ; *In re Girard,* 186 Cal. 718 [200 Pac. 593] ; *Barrett* v. *Gore,* 88 Cal. App. 372 [263 Pac. 564].) In *West* v. *Crawford, supra* (pp. 27, 31), the court says: '' . . . it amounts to a subscription to the stock of a corporation, to be thereafter organized; and in addition, it is an express promise to pay to the plaintiff in this action twenty per cent of the amount of such subscription. . . . The parties mutually agreed with each other, that is, with those who signed the contract, to pay a certain sum of money to the plaintiff. He was thereby made a trustee of an express trust, and authorized to collect the money agreed to be paid. . . . The parties by their mutual agreement made the plaintiff their trustee to collect and receive the money to be paid.''

█ In the case at bar, we have all the elements of a company, defined as trust under subdivision 4 of section 2 of the act; of a security as it is defined in paragraphs (a) and (d) of subdivision 7 of section 2 and construed in *People* v. *Oliver, supra;* and a sale within the definition of subdivision 9 of section 2, since the contract in issue purported to sell units of stock at a price set forth in the contract. Under these circumstances upon the acceptance by the committee of any of the subscriptions which the complaint clearly shows were taken prior to any permit being issued, there was a violation of the act squarely prohibited by section 3, declared void by section 12, and the issuers under sections 13 and 14 were guilty of a public offense and punishable by fine or imprisonment.

There is no allegation in the complaint that indicates that any of these subscriptions were taken after the permit which was originally issued to the committee mentioned in the preorganization subscription agreement. To the contrary, the language of the complaint with respect to this originally issued permit shows clearly that all it purported to do was to authorize the committee to negotiate for, offer for sale and take subscriptions from and after December 19, 1929. It seems obvious that if the organization committee needed a permit to negotiate for, offer for sale and take subscriptions after December 19, 1929, that they needed a permit to take the subscriptions which included that of respondent Lee, and which they gathered between January 15, 1929, and December 19, 1929.

█ Further, it appears from the complaint in question that no permit of any kind was issued to either corporation until August 6, 1930, and that the Holding Company was organized October 4, 1929, and the Operating Company on January 13, 1930, and that the subscriptions, including that of respondent, were accepted by both companies before either had a permit, as required by section 3 of the Corporate Securities Act. Such acceptance without a permit was clearly void. (Sec. 12, Corporate Securities Act; *Reno* v. *Ice Machine Co., supra; Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285]; *Commercial Bldg. Co.* v. *Levy,* 108 Cal. App. 54 [290 Pac. 1048].)

█ It is settled that the provisions of the Corporate Securities Act in force at the time the contract was made

became a part of the contract, and that compliance with the terms of the act, as well as with the written provisions of the contract must be pleaded. (*Napa Valley Electric Co.* v. *Calistoga Electric Co.*, 38 Cal. App. 477 [176 Pac. 699]; *Burki* v. *Pleasanton School District*, 18 Cal. App. 493 [123 Pac. 546]; *Harlie R. Norris Co., Ltd.,* v. *Lovett, supra;* Civ. Code, sec. 1439; *Willcox* v. *Edwards*, 162 Cal. 455 [123 Pac. 276, Ann. Cas. 1913C, 1392]; *Estate of Whiting*, 110 Cal. App. 399 [294 Pac. 502]; *Estate of Frees*, 187 Cal. 150 [201 Pac. 112].)

A failure to plead compliance with the law, as well as with the written provisions of the contract, renders the complaint subject to and vulnerable against demurrer. (*Di Fiore* v. *Bohnett*, 54 Cal. App. 88 [201 Pac. 145]; *Gibson* v. *Hercules Mfg. etc. Co., Inc.*, 80 Cal. App. 689, 702 [252 Pac. 780].)

An analysis of the original complaint and the proposed amended complaint discloses further that the plaintiff not only has failed to plead compliance with the law, but in addition that neither complaint pleads compliance with the written terms of the agreement itself.

Nowhere in either complaint is it alleged that 10,000 shares of the common stock of the Operating Company were issued to the Ritz Carlton Management · Corporation, as provided in the subscription agreement, or that the subscription agreement was ever approved by the commissioner of corporations, or that the committee performed the agreement. In addition, there is a negative showing, but none the less binding upon the pleader, that the shares issued were on terms different from those in the subscription agreement. The allegation in this latter respect is that plaintiff tendered the shares to defendant Lee "subject, however, to and in accordance with the terms and conditions of such subscription agreement and said permit". The terms of the permit were not pleaded in either complaint, and in face of a demurrer for uncertainty, the court has a right to assume, since no attempt was made to correct this evasive allegation, that if the terms of the permit were set forth they would be against the pleader. (*Smith* v. *Buttner*, 90 Cal. 95 [27 Pac. 29]; *Whittemore* v. *Davis*, 112 Cal. App. 702 [297 Pac. 640].)

In face of direct averments which are made showing failure to comply with the agreement, and the failure of appellant to clarify evasive allegations to which objections were

made upon demurrer for uncertainty and ambiguity, appellant's general allegation of performance does not help its pleading. (*McNulty* v. *New Richmond Land Co.*, 44 Cal. App. 744 [187 Pac. 97]; *California etc. Assn.* v. *Rindge L. & N. Co.*, 199 Cal. 168 [248 Pac. 658, 47 A. L. R. 904].) In the latter case the court says at page 179: " 'Where a plaintiff alleges performance of a contract on his part in general language "the general allegation will not save the complaint where, in addition, plaintiff sets out what he has actually done, and such facts fall short of due performance".' "

The second cause of action in the original complaint is subject to the same defects as the first, because it is obvious that the second cause of action is merely a restatement of the first in the form of a common count. It alleges an "amount due and unpaid under that certain agreement alleged in the first cause of action . . . " The "agreement" alleged in the second cause of action is obviously subject to the same objections as the agreement in the first cause of action.

We believe that it has been satisfactorily shown that the agreement was one in which preorganization subscriptions were taken and that such subscriptions became invalid by reason of the failure of appellants to comply with the Corporate Securities Act, and that the original complaint did not state a cause of action on either of the causes of action which it pleaded.

We now proceed to the second point raised by appellant, i. e., was a new contract made between the parties under the doctrine of *Moore* v. *Moffatt, supra.* In treating this question, we will also consider the sufficiency generally of the proposed amended complaint. This amended pleading which the court refused appellant permission to file, alleged three causes of action. The first and third causes of action of the proposed amended complaint were mere restatements of the first and second causes of action of the original complaint, both of which, however, were and are subject to the defects which have already been pointed out. The second cause of action of the proposed amended complaint alleges substantially the same background as that alleged in the first cause of action of the original complaint, but in addition alleges that on or about February 1, 1930, and also immediately following the incorporation of the two companies, both companies did "adopt and accept the terms and conditions of said agreement

as the terms and conditions of a new and binding agreement between them . . . " Further, it is alleged that the parties to the agreement at no time contemplated that the stock would be issued or sold prior to the incorporation of the companies and the issuance of a permit therefor, and that no stock was issued or sold. A general allegation then follows, in which it is asserted that the Corporate Securities Act is in violation of the Constitution of the United States. Appellants undoubtedly mean to plead that after a permit was issued to the companies, a call was made for payment on the subscribers, including respondent Lee, and that respondent Lee complied with such call by making a first or second payment by virtue of which the parties by operation of law made a new agreement valid under the doctrine announced in *Moore* v. *Moffatt, supra.*

It is worthy of note that appellants did not plead the facts suggested, contenting themselves with an allegation of a conclusion of law which tenders no issue. (*Vanasek* v. *Pokorny,* 73 Cal. App. 312, 317 [238 Pac. 798]; *Blackwood* v. *McCallum,* 187 Cal. 655, 659 [203 Pac. 758]; *Davies* v. *Ramsdell,* 40 Cal. App. 424, 430 [181 Pac. 94]; *Turner* v. *White,* 73 Cal. 299, 301 [13 Pac. 794].) As already pointed out, it cannot be ascertained from the original or amended complaints when respondent Lee made his two payments, whether one was made at the time the subscription was taken, or whether one or both were made after the issuance of a permit to the members of the management committee. Whether one or both were made after or before the issuance of a permit to the companies nowhere appears. All that is alleged in the proposed amended complaint is that on August 6, 1930, a supplemental permit was issued to the companies (supplemental, however, only in the sense that it was supplemental to the permit originally and first issued to the members of the management committee); and that "defendant has heretofore paid to plaintiffs or one of them or to said committee, on account of the instalments of said agreement the first two instalments amounting to the sum of $5,032 and no more . . . " It will be noted that this adds further uncertainty to the time of payment, since, as already pointed out, the original complaint alleges first payment "on or about May, 1931". It is of the very essence of the principle enunciated in *Moore* v. *Moffatt, supra,* that assuming an illegal sub-

scription in the first instance, payment be made or negotiations be had *after the issuance of a valid permit*. The evasive allegations of the proposed amended complaint furnish no clue on this important fact, but because of the liberality which we feel trial courts should exercise in permitting amendments to complaints, we will treat the proposed amended complaint, assuming that the pleader could allege facts which would meet the requirements of the factual situation so far as payment and negotiation are concerned, as in *Moore* v. *Moffatt, supra.*

It may be conceded as a general proposition that a litigant is entitled almost as a matter of right to amend a defective complaint at least once, and thus be given an opportunity to properly state a cause of action, if one can be alleged. If, however, it is apparent from the facts which are alleged in the original complaint, that no cause of action can be stated, and this situation is further verified by a proposed amended complaint which, in the teeth of general and special demurrers, fails to set out vital elements of a good cause of action, a trial court would be exercising an academic discretion on a worse than moot situation, if it did anything but sustain without leave and refuse to grant leave to amend. The sole remaining question, therefore, is whether the added cause of action in the proposed amended complaint added anything, either by stating a good cause of action or in suggesting that a good cause of action could be stated, even though, as it was presently framed, it did not state one. If the new cause of action did either of these things, permission should have been granted for its filing. If it did not, permission was properly refused. Since the new cause of action alleged in the proposed amended complaint is bottomed entirely upon the doctrine of the case of *Moore* v. *Moffatt, supra,* it may not be amiss to set out the facts and doctrine of that case. The suit there was brought by a trustee in bankruptcy "to recover, under the trust fund theory, the difference between the sums paid on a subscription agreement for stock in the corporation and the par value of said stock, irrespective of the terms of the agreement". Although it does not appear when the company was incorporated, it was stipulated that prior to incorporation, one Neeland and one Beggs entered into an agreement to purchase 96 shares of the capital stock of Admiral etc. Company at $25 per share, payable $400 on

January 1, 1915, and $400 on the first of each and every month through to and including the first day of June, 1915. Upon payment of each $400, 16 shares of stock were to be issued. The stock was thereafter paid for in accordance with the terms of said subscription, but was not issued at any time to Neeland and Beggs. The company was organized with an authorized capital stock of one hundred thousand dollars with shares of the par value of $100 each. No permit authorizing any sale of stock by the company was issued until September 10, 1915, which permit was superseded by an amended permit issued and dated October 24, 1915. The amended permit authorized the issuance and sale of 600 shares of preferred stock at $30 per share. Thereafter, pursuant to the direction of the subscribers Neeland and Beggs given on December 1, 1915, the corporation on December 11, 1915, issued the 96 shares of stock paid for by Neeland and Beggs to one Warmington, who was and was known by Neeland and Beggs to be bankrupt. The corporation, from the time of its organization until its bankruptcy, was insolvent and was known to be insolvent by the subscribers Neeland and Beggs. No demand was ever made for the unpaid purchase price nor was any assessment ever levied. The corporation went into bankruptcy April 6, 1916. The trustee in bankruptcy brought the action against the subscribers, who had paid less than $100 a share, which was the par value of the stock, for the difference between what they had paid and par; including Neeland and Beggs on the theory that a stockholder in fact cannot escape liability by having stock in an insolvent corporation transferred to a financially irresponsible person. (*Moore* v. *Moffatt, supra.*) The subscribers took the position that they were not stockholders because, as the court in its opinion conceded, "the subscription agreement was in its inception void and incapable of acceptance by the corporation because executed, in contravention of the provisions of the Investment Company's Act (Stats. 1913, p. 715), prior to the procurement of a permit . . . " A nonsuit was granted in the lower court, which judgment of nonsuit was reversed. The doctrine which is apparently announced by the court, and upon which, as already pointed out, appellant here predicates an additional cause of action, is that in spite of the invalidity of the original issue of stock by the corporation to the subscribers, there was a continuing

offer from the subscribers to the corporation, and that since a permit was subsequently issued to the corporation, pursuant to which stock was issued to the subscribers involved, that a new contract was made between the subscribers and the corporation, as a result of a continuing offer to purchase which was accepted as of the date of the new permit issued to the corporation. The court said (p. 6) : "The agreement, so considered, and having been in fact ultimately accepted by the corporation after the required permit had been procured —as evidenced by the issue of the stock upon the order of the defendants—the validity of its making and acceptance must be measured and tested by its character as revealed by the circumstances and conduct of the parties with relation thereto at the time of its ultimate acceptance rather than by the circumstances attending its mere physical making in the first instance."

In the Moffatt case, *supra,* the subscribers, after the issuance of a valid permit, directed the corporation, and the corporation pursuant to such direction, issued certificates of stock of the par value of $100 per share upon which they had paid only $25 per share. In the case at bar, there is no allegation that respondent did anything after a permit was issued to the corporation. Furthermore, it appears affirmatively in the second cause of action of the proposed amended complaint that "no shares of stock whatsoever have been issued or delivered". It also appears by reason of the evasive allegation in the proposed amended complaint, that respondent paid nothing after the issuance of the permit to the corporation in the instant case, as distinguished from the members of the management committee, but, on the contrary, denied that he was liable in any amount or for any further payments.

There are other distinctions which could be pointed out, but in view of the conclusion we have reached that the doctrine advanced by that case has no application here, irrespective of the distinctions alluded to save the essential one which is made by the Moore case itself, we deem it unnecessary to make them.

An analysis of the case of *Moore* v. *Moffatt, supra,* and of the cases which have since followed, has convinced us that the doctrine of that case is, and is intended to be, an exception to the general rule, and applies only to those situations in

which a representative of creditors is attempting to recover from parties to whom stock has been issued without full payment, or where the rights of innocent third parties intervene. It is apparent that neither of the exceptions mentioned is included in the situation here. At best the appellants in this case have such rights as were acquired by the organization committee and no others. (*Walker* v. *Harbor Realty etc. Corp.*, 214 Cal. 46 [3 Pac. (2d) 557] ; *Olds* v. *Simmons, supra; Herkner* v. *Rubin, supra; Honn* v. *Hamer*, 81 Cal. App. 276 [253 Pac. 336] ; *Reno* v. *American Ice Machine Co., supra.*) In the Reno case, *supra,* the court says at page 413 : "The case of *Moore* v. *Moffatt*, 188 Cal. 1 [204 Pac. 220], relied upon by appellant as contrary to the doctrine we have just announced does not so impress us. That was not an action between the parties to a void contract, but an action by a trustee in bankruptcy of a corporation to recover the unpaid subscription price of stock for the benefit of creditors. *That situation presents an exception to the rule above announced,* which rule is suspended in the interests of innocent third persons who have relied upon the contract." (Italics ours.) In the Walker case, *supra,* the court says at page 48 : "No facts have been presented or offered which could bring this case within the exceptions noted in such cases as *Moore* v. *Moffatt*, 188 Cal. 1 [204 Pac. 220], *Domenigoni* v. *Imperial Live Stock Co.*, 189 Cal. 467 [209 Pac. 36], and *Mitchell* v. *Grass Valley Gold Mines Co.*, 206 Cal. 609 [275 Pac. 418], where rights of others than the parties to the void sale or contract were involved and the buyer had by his own conduct made himself answerable to the claims of such third parties. . . . The present action involves the rights only of the parties themselves. We conclude that the court did not err in rejecting the proffered testimony."

In *Herkner* v. *Rubin, supra,* the court says at pages 680, 681 : "Plaintiff concedes that the statutory requirements were not met, but contends that the agreement having been valid when executed, as was found by the trial court, and deliveries of merchandise pursuant thereto having been made after the company was incorporated, this was tantamount to an election to adopt its terms and conditions as those of a new subscription agreement and that defendant is consequently liable. That such facts standing alone might have the effect claimed finds support in *Moore* v. *Moffatt*, 188 Cal. 1 [204

Pac. 220], where, notwithstanding a subscription agreement was executed previous to the procurement of a permit required by the Investment Companies' Act (Stats. 1913, p. 715), a valid permit was subsequently obtained, and pursuant thereto the stock was issued and accepted. . . .

"The stock was not issued in conformity with the permit; and where such is the case section 12 of the Corporate Securities Act declares the same to be void, and section 13 of the same act that any company so issuing its stock would be guilty of a public offense.

"Where a statute prohibits or attaches a penalty to the doing of an act the act is void; . . . and this is true of an issuance of stock in violation of the permit granted by the corporation commissioner . . . Moreover, the doctrines of estoppel by conduct and ratification have no application to a contract which violates an express mandate of the law. (*Pollak* v. *Staunton,* 210 Cal. 656 [293 Pac. 26].)'' (See, also, *In re American Aluminum Products Co.,* 15 Fed. (2d) 234; *Horn* v. *Abts,* 19 Fed. (2d) 350; *In re Builder's Finance Assn., Inc.,* 26 Fed. (2d) 123; *Imperial Live Stock Co.* v. *Tracy,* 208 Cal. 205 [281 Pac. 50]; *Olds* v. *Simmons, supra.*)

 Appellants' point that the Corporate Securities Act is unconstitutional need not be treated any further than to say that the law does not sustain such contention. (*In re Leach,* 215 Cal. 536 [12 Pac. (2d) 3]; *People* v. *Eiseman,* 78 Cal. App. 223 [248 Pac. 716]; *In re Girard,* 186 Cal. 718 [200 Pac. 593]; *Agnew* v. *Daugherty,* 189 Cal. 446 [209 Pac. 34]; *Cecil B. De Mille Productions, Inc.,* v. *Woolery,* 61 Fed. (2d) 45.)

It has also been settled that upon facts such as in the case at bar the parties are not *in pari delicto.* (*Tatterson* v. *Kehrlein,* 88 Cal. App. 34 [263 Pac. 285]; *Barrett* v. *Gore,* 88 Cal. App. 372 [263 Pac. 564]; *Smith* v. *Bach,* 183 Cal. 259 [191 Pac. 14], and other cases heretofore cited.)

 The good faith of the management committee is not questioned, but under the law actual good faith is of no import, if the law has not been complied with. (*Boss* v. *Silent Drama Syndicate,* 82 Cal. App. 109, 115 [255 Pac. 225]; *Commercial Bldg. Co.* v. *Levy,* 108 Cal. App. 54, 56 [290 Pac. 1048]). As said in *Herkner* v. *Rubin, supra:* "Irrespective of the integrity of the organizers or directors of the corporation the law must be obeyed."

154

For the foregoing reasons, the judgment of dismissal entered upon the order sustaining the demurrer of defendant Lee without leave to amend is affirmed, and the appeal from the order refusing appellants permission to file an amended complaint is dismissed.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 18, 1935, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 22, 1935.